# Richmond

PENDLETON W. TATE V. LUCY OGG.

March 10, 1938.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*L. Cutler May,* for the appellant.

*W. Earle Crank,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

The plaintiff, Pendleton W. Tate, on November 19, 1936, filed a suit in equity alleging that the horses, cattle and pigs, and more especially the turkeys of the defendant, Lucy Ogg, for many years and with great frequency, had been trespassing upon his lands and destroying his crops; that there was such a threat of continued and future injury therefrom as would cause the plaintiff great and irreparable damage; and that he had no adequate remedy at law. He prayed that an injunction issue restraining the defendant, her agents and employees, from maintaining and permitting the alleged trespasses to continue.

The defendant demurred, and for grounds of her demurrer stated that the plaintiff had an adequate remedy at law for the alleged trespasses of the horses, cattle and pigs, and as to the alleged trespasses of the turkeys, the complainant had failed to fence his land against domestic fowls as required in Virginia. She also filed her answer, in which she denied the material allegations of the plaintiff's bill, and relied upon the second ground of demurrer.

The trial court heard the evidence *ore tenus,* and a summary of the evidence is certified in the record.

The trial court, by decree of December 3, 1936, being of the opinion that the alleged trespasses were only of a minor and inconsequential nature, and the damages only trivial, denied the relief prayed for.

The plaintiff, while admitting that the trial court had the right to accept the evidence of the defendant, and to reject that of the plaintiff, contends that the evidence of the defendant alone justified the granting of the injunction.

A large proportion of the briefs of each counsel is taken up with a discussion of the rule of the common law, which requires the owner of animals to keep them on his own land, or within enclosures. Since it was apparent from the evidence that the alleged trespasses by the livestock of the defendant, such as horses, cattle and pigs, were in reality of such seldom occurrence and trivial nature, the plaintiff in his brief and in his argument, practically abandoned any claim to relief from that source. He insists, however, that the evidence does establish such repeated, continuous and threatened trespasses by the turkeys as to warrant relief therefrom in equity.

The plaintiff contends that turkeys are domestic animals, and that the common law rule, which requires the owner to keep such animals enclosed, is in force in Louisa county. The defendant argues that the rule is not in force in Louisa county, nor in Virginia, having been changed by statute, and even if it be in force, that the trespasses complained of were infrequent, trivial and inconsequential.

As a general principle of law, every person is entitled to the exclusive and peaceful enjoyment of his own land, and to redress if such enjoyment shall be wrongfully interrupted by another. This rule applies to acts of trespass by domestic animals, unless some provision of law requires the landowner to actually fence out such animals. When a boundary line has been made by statute a lawful fence as to certain animals, the owner of such animals is liable for damage committed by their acts of trespass.

The books abound with many cases relative to acts of trespass committed by such domestic animals and livestock as cattle, horses, pigs, sheep, etc., but few relate to domestic poultry.

This is the first time that this court has been called on to pass upon the question of liability for a trespass by

chickens, turkeys, or domestic fowls. So far as a diligent search discloses, only three of such cases have reached courts of final resort in the United States. Two of these cases are from Iowa and one from Missouri. Each specifically involves chickens. *Keil* v. *Wright* (1907), 135 Iowa 383, 112 N. W. 633, 13 L. R. A. (N. S.) 184, 124 Am. St. Rep. 282, 14 Ann. Cas. 549; *Kimple* v. *Schafer* (1913), 161 Iowa 659, 143 N. W. 505, 48 L. R. A. (N. S.) 179, Ann Cas. 1916A, 244; *Evans* v. *McLalin, et al.,* 189 Mo. App. 310, 175 S. W. 294.

In the case of *Keil* v. *Wright, supra,* the court held that since under general principles a landowner should not be disturbed in the exclusive and peaceful enjoyment of his premises, an injunction would lie to restrain domestic fowls from trespassing upon his property. It was specifically stated in the opinion that the question as to whether or not the common law rule as to trespass by domestic fowls was in force in Iowa had not been raised at the proper time in the pleadings and had not, therefore, been considered.

In the second Iowa case of *Kimple* v. *Schafer, supra,* the holding in the above case as applicable in Iowa was expressly overruled. The subsequent opinion held that the common law rule, with reference to trespass of domestic animals, was not, and never had been, in force in Iowa; and that in the great western States where there are vast regions of land, where chickens, turkeys and poultry are raised on a large scale in the rural communities, an injunction against trespass by them will not be held applicable in the absence of a statute, requiring a contrary conclusion. It appears from the opinion that the legislature of that State had enacted regulations as to the running at large of many kinds of domestic animals, but none restricting and regulating poultry and fowls, except in cities and towns.

The case of *Evans* v. *McLalin, et al., supra,* is in agreement with the holding in the second Iowa case. The Missouri court seemed to take considerable pride in the fact that Missouri was the greatest poultry State in the Union. It

describes poultry as being "privileged characters," and as in the Iowa case, treats them as "free rangers."

■■ We find the case of *Poindexter* v. *May*, 98 Va. 143, 34 S. E. 971, 47 L. R. A. 588, most illuminative in setting out an historical review of the common law rule as to trespass by domestic animals, and the effect of certain changes therein by statute in Virginia. In that case, an injunction was sought to prevent the owner of cattle and horses from turning them out upon the unenclosed land of his adjacent neighbor. The defendant contended that, in the absence of a lawful fence on the said lands, as defined in the Code of Virginia, his horses and cattle had a right to run thereon, and there was no remedy therefor. At the time of that decision in 1900, neither had the landowner erected a lawful fence under the statute, nor had the boundary line of his property been declared a lawful fence under statutory proceedings. The opinion held that while at common law the owner of domestic animals was required, at his own peril, to keep them on his own land, or within enclosures, the rule had been changed in Virginia, as to certain animals, including horses and cattle, by legislative action, except in those counties where a "no fence" law had been adopted under the provisions of the Code. The court said, in granting the relief asked for, that the change in the common law rule did not apply to a wilful trespass by domestic animals, and that the owner of cattle and horses, who drives them upon the lands of another, is answerable for whatever damage they do while there. This case is of no value as an authority here except in setting out a review of the common law rule and the history and effect of the changes made by statute.

■ The common law rule was, in general terms, applicable to domestic animals. Viewed in its broad sense, the word "animal," in the language of the law, is used in contra-distinction to a human being, and signifies an inferior living creature, generally having the power of self-motion. 2 Am. Jur. 689. It may, therefore, be said to include domestic turkeys and poultry.

In Virginia, by Code 1936, section 2, the common law of England is continued in force and effect, except insofar as it may be in conflict with the Bill of Rights and the Constitution, or has been changed by legislation.

A change in the common law rule in Virginia as to certain animals, is now evidenced by the present chapter on "Enclosures and Trespasses," Virginia Code 1936, sections 3538-3562, inclusive.

Code, section 3541, provides for the recovery of damages for trespass by the animals mentioned in section 3548.

Section 3548 makes it unlawful to permit "any horse, mule, cattle, hog, sheep, or goat" to run at large upon lots or lands enclosed by a lawful fence.

Section 3538 provides the definition as to what shall constitute a lawful fence.

Section 3547 provides how the boards of supervisors of counties may adopt the boundary lines of lots or lands as lawful fences.

The plaintiff alleges in his brief that the boundaries of his land in Louisa county had been made a lawful fence in accordance with Code, section 3547. The record, however, is silent on that subject; but in the view that we take of this case, we do not consider that point material here.

None of the above Code sections make any reference to chickens, turkeys, poultry or domestic fowl. We do not find any attempt by the legislature to make a general provision to prevent or regulate such domestic fowls from running at large, nor any general statute requiring a landowner to fence his land for protection against the fowl of another.

The livestock named in the above Code sections are quadrupeds and animals, whose self-motion is confined to the ground. The word "cattle" in common acceptation is a collective name for domestic quadrupeds, such as horses, mules and those which serve as food for man. 2 Am. Jur. 690.

Section 3538 refers to an actual fence and its constituent materials and its measurements. It further specif-

ically refers by mention and name to the stock described in sections 3541 and 3548, "which could not creep through the same." That it may be built only forty-two inches high, with intervals between the boards or the strands of wire, running to eight inches, indicates that the legislature gave no thought to the building of a fence designed to keep out chickens, turkeys, or other poultry or fowl. To require the erection of a fence around a large farm sufficiently tight and high to keep out fowls, such as turkeys, might well be prohibitive because of the cost.

The very nature of poultry,—the fact that they can fly as well as walk and that they roost on fences and in trees,— places them in a different classification from other domestic animals, both with regard to the manner of travel and to the nature of confinement required to prevent travel. All of this, perhaps, accounts for the omission of turkeys and fowls from the list of animals named in sections 3541 and 3548.

Likewise, dogs are, by reason of their nature, habits, disposition and usefulness, treated as belonging to a separate classification as animals. In Virginia they are made the subject of special and peculiar regulations. Code 1936, section 3305 (62) *et seq.*

If chickens, turkeys or fowls were included among the domestic animals covered in the rule of the common law, we can find no removal from such inclusion by statute in Virginia. The language of Code, sections 3538, 3541 and 3548, specifically naming "any horse, mule, cattle, hog, sheep, or goat," *ex vi termini* excludes the applicability of these statutes to fowls or dogs. The legislature changed the common law rule of trespass with reference to the named animals, and it had the power also to change it as to poultry and fowl. In the absence of any such change, we cannot infer that it was so intended. The maxim *"Expressio unius est exclusio alterius,"* is especially applicable in the construction and interpretation of statutes. *Whitehead* v. *Cape Henry Syndicate,* 105 Va. 463, 54 S. E. 306.

■ We conclude that the common law rule requiring the owner of domestic animals to keep them on his own land, with respect to fowl, is in force in Virginia, and is applicable in this case.

■ We are in accord with the general principle that when acts of trespass by animals are being continually repeated and threatened, in a jurisdiction where the owner is required to keep his animals on his own premises, and the remedy at law is insufficient, a court of equity will grant relief by injunction. Where the damages are more than merely trivial, and it would be impossible to accurately measure them at law, or where a multiplicity of suits would be required to recover a small amount of damages for each of several separate acts of trespass, or where the owner of the animals may be insolvent, injunctive relief may be granted. High on Injunctions, section 702-a; 32 A. L. R. 540; 14 R. C. L. 154.

■ One may not in Virginia raise a flock of turkeys for his own use, or for commercial purposes, and either wilfully drive them, or carelessly permit them to go upon the lands of another, and there destroy the property of the other. But where the fowls on adjacent farms merely make infrequent visits to the property of the adjoining landowner, and the damages thereby are inconsequential, and the circumstances indicate that the fowls have escaped for only a few minutes from their pens or from the vigilance of their landowner, and there is no good reason to believe that the trespasses will continue in the future, relief by injunction will be denied.

The remaining question resolves itself into one of fact. Does the evidence justify granting the relief prayed for? If it makes out a case against the defendant, the judgment of the trial court was erroneous.

In the great rural, agricultural community of Louisa county, the parties hereto own adjoining farms. Mr. Tate's lands comprise eighty-one acres, upon which he raises mostly corn and wheat, and some peas and other crops. He owned a limited number of cattle, two mules, one horse

and two cows, one hundred and fifteen to one hundred and twenty chickens, and three dogs. Mrs. Ogg owns 141 acres, upon which she does some farming, and raises some turkeys. She also owned four horses, twelve cattle and some pigs.

The evidence with reference to trespass by Mrs. Ogg's horses, cattle and pigs shows, perhaps, in seven years, three such isolated acts; one where her colt got hung up in the fence and remained on Tate's land for five minutes; another where the pigs wandered across the boundary line for a few minutes; and one instance where her bull ate some grass for fifteen minutes. This we regard as almost inevitable in farm and country life.

While the lands of the parties adjoin, their respective dwelling houses are about one-half a mile apart. A division fence half a mile long runs on a line about midway between the houses, with a four-strand wire.

While Mrs. Ogg has owned turkeys since 1921, in varying numbers, the record is so shadowy as to alleged depredations by them for the years prior to 1930, we will not go back prior to that year.

In 1930, she raised eight turkeys. In 1931 and 1932, she raised turkeys in pens, the pens occupying about two and one-half acres, and being enclosed by a five and one-half foot fence. In 1933, she kept them in these pens until they were grown, and although they were then turned out, they did not go on Tate's place. In 1934, she had one hundred and ten turkeys, which were kept in coops until they were six weeks old, during which year she admits they got on Tate's land a few times by flying out of the pens. In 1935, she raised thirty-nine turkeys in a pen on another place, and they did not get out at any time during that year. In 1936, she had between one hundred and fourteen and one hundred and seventeen turkeys, and during that year some of them strayed on Tate's place for five or six times; but they got only on the edge of his land and never more than forty feet thereon. She has had her two single girls and a son at her home since 1934, and they kept a close and constant watch on the turkeys. The vigilance of Mr.

Tate, and more frequently the vigilance of Mrs. Ogg, caused the wandering turkeys to make such a hurried return home that any damage caused was restricted to a small area and a small amount.

The record does not show how many turkeys ever got on Tate's place, nor does it give any estimate of damages, except the suggestion of Tate that, maybe, several visits alleged to have been made by the turkeys on his land in the fall of 1936 caused a loss of ten dollars.

We are not advised whether the course of travel by the turkeys was by air-flight, by foot, over the fence, around the fence, under the fence, or between the strands.

Mrs. Ogg also relates that the visits of her animals were, on several occasions, returned by visits of the cattle and livestock of Mr. Tate to her lands.

It seems that Tate's dogs killed some of Mrs. Ogg's turkeys three times during the year 1936, when the turkeys were not on his place. The game warden of Louisa county, after making an investigation of the killing, for the purpose of reimbursing the owner of the turkeys, secured, on his own initiative and in pursuance of his duties, an order from the trial justice of his county directing him to kill Tate's dogs, because of the above mentioned attacks. The three dogs of Tate were accordingly killed.

There is some evidence for the plaintiff in conflict with the number and frequency of the trespasses of the turkeys upon his land. The testimony of the plaintiff himself, however, in this regard is in conflict and confusing.

It is necessary, in order to get a complete picture of the situation, to add that there was a more or less bitter feeling between the parties. Mrs. Ogg had refused to testify for Tate in some litigation over a will, and her son had testified against him, for which he had cursed and abused her. He blamed Mrs. Ogg for instigating the killing of his dogs, although the game warden assumed the responsibility, and contradicted Tate in this respect.

This court will take judicial cognizance of the fact that it is the nature of a turkey to chase a grasshopper,

or other bugs, or insects, without paying much attention to fences or boundary lines. A court of equity will not dignify such occasional chase with a restraining order. Under such circumstances, it seems improper to grant an injunction restraining the owner of fowls from permitting them to escape from his own enclosure under penalty of contempt for a violation thereof.

We are unable to say that the learned, able and experienced trial judge, who had the benefit and advantage of seeing and hearing all of the witnesses testify in this case, came to an erroneous conclusion as to the value of the facts. The evidence favorable to the defendant shows that the trespasses were only occasional and not wilful, and that the damages at most were of a trivial and inconsequential nature.

The decree of the trial court is affirmed.

*Affirmed.*