## B. PERLIN v. NORMAN CHAPPELL.

March 11, 1957.

Record No. 4624.

Present, All the Justices.

The opinion states the case.

*William L. Shapero* (*Maurice B. Shapero* and *Shapero & Shapero*, on brief), for the plaintiff in error.

*Henry E. Howell, Jr.* (*Jett, Sykes & Howell*, on brief), for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

B. Perlin, defendant in the lower court, seeks by this writ of error to reverse a judgment for $10,000 entered on a verdict finding him guilty of negligence in permitting a 1100 pound, "mixed-breed" Brahma heifer to escape from his stockyard and injure Norman Chappell, plaintiff in the trial court.

Defendant's first contention is that the evidence is insufficient to support the verdict.

The evidence, with all fair inferences therefrom stated most favorably to plaintiff, may be summarized as follows: Defendant owns and operates a stockyard and slaughterhouse within the city of Norfolk. About midnight on March 14, 1955, Carl Meixel, an employee of defendant, returned from Richmond with a truck load of 18 or 19 cattle, including the Brahma heifer, which he placed in pen 4 of the stockyard and locked them up for the night. The gate to this pen was at the end of a lane approximately 95 feet long and almost 11 feet wide. The other end of the lane led to the unloading platform or chute where the cattle had been unloaded from the truck the night before. On both sides of the lane there were other pens enclosed by board fences more than five feet tall with gates opening therefrom into it. In addition to this long lane, another lane at right angles to it led directly to the slaughter pen.

Between eight and eight thirty on the morning of August 15th, Carl Meixel and his brother, Walter, another employee of defendant, returned to the stockyard for the purpose of driving the cattle out of pen 4 into the slaughter pen to be killed and dressed. For this purpose they opened the gate to pen 4 and while yelling and waving pitch-

forks or large sticks, they prodded the cattle out of pen 4 into the lane, expecting to turn them into the lane leading to the slaughter pen. While they were driving the cattle down the long lane toward the loading chute and the lane leading to the slaughter pen, the Brahma heifer became frightened, "excited" or "skittish" and jumped out of the lane, over a fence more than five feet high, into pen 5. One of the employees opened the gate to pen 5 leading into the long lane and the other employees, hollering and waving his prodding stick, drove the heifer back into the lane with the other cattle. She again jumped from the lane back into pen 5, and this time tried to jump the outside fence which was five feet eight and one half inches high, broke the top board and fell back into the pen. The employees again drove her out of pen 5 back into the long lane. This time she ran by the other cattle all the way to the end of the lane where she jumped the outside gate, which was five feet three inches high, onto the loading platform, squeezed by a truck parked thereon, ran across an open field to and down Indian River road.

Carl Meixel jumped into a truck and started after the heifer. Walter Meixel informed the other employees of defendant in the slaughterhouse that the heifer had gotten out, and five of them ran out to assist in getting her back into the stockyard. Walter Meixel obtained a rifle and pursued the heifer in a car. Carl Meixel in the truck caught up with the heifer and unsuccessfully tried to knock her down. Thereafter she ran through the gate leading into the Colonna Shipyard and started across a railroad trestle.

In the meantime, Carl Meixel had followed the heifer into the shipyard and had gotten out of the truck when his brother arrived and gave him the rifle, because he was a better shot, and told him the gun was ready to shoot. About that time the heifer turned back from the railroad trestle and ran directly toward Carl, who aimed the gun but did not shoot because the safety was on. He stepped out of the heifer's path and as he did so she immediately thereafter struck plaintiff, an employee in the shipyard, on the left side and knocked him up against a pile of lumber, thereby inflicting the injuries of which he complains. At the time he was struck, plaintiff, who was 61 years old and weighed 220 pounds, was going from the oil house back to the shop in which he worked. Several people close to him were yelling "the cow is coming back, don't try to stop her." It does not clearly appear just when plaintiff first saw the heifer, however, one of the eye witnesses testified that he appeared to be so frightened

that "he could not move." The heifer stopped running approximately 100 feet from the point where she struck plaintiff and was killed by a single shot fired by Carl Meixel.

Defendant argues that under "the present law existing in the State of Virginia, there was no duty upon appellant [defendant] to maintain fences." This line of argument is based on the admitted fact that the common law of England, which requires the owner of domestic animals, with or without a fence, to keep them off the land of other persons, is not in force in Virginia. We so held in *Poindexter v. May*, 98 Va. 143, 34 S. E. 971; *Tate v. Ogg*, 170 Va. 95, 195 S. E. 496. The fact that this common law rule is not the law in Virginia, does not relieve the owner of domestic animals of the responsibility under another principle of the common law, which "imposes upon every person the duty to exercise ordinary care in the use and maintenance of his own property to prevent injury to others." *Rice v. Turner*, 191 Va. 601, 605, 62 S. E. 2d 24.

Defendant also argues that he was guilty of no negligence because the fences around his stockyard were at least "five feet high" and therefore lawful fences as defined in Code, § 8-869. A complete answer to this line of argument is that the statutory provisions, (Code, §§ 8-866 to 8-905), dealing with lawful fences and the trespass of stock are applicable within counties and not applicable within cities and towns. Furthermore, a "statute is not necessary to establish the duty of ordinary care. Such duty may arise from statute, from a municipal ordinance, or from the relation of the parties." *Rice v. Turner, supra*, 191 Va., at page 605. *Kelly v. Willis*, 238 N. C. 637, 78 S. E. 2d 711; *Smith v. Whitlock*, 124 W. Va. 224, 19 S. E. 2d 617, 140 A. L. R. 737; 2 Am. Jur., Animals, § 60, p. 737.

" 'Reasonable care' or 'ordinary care' is a relative term, and varies with the nature and character of the situation to which it is applied. The amount or degree of diligence and caution which is necessary to constitute reasonable or ordinary care depends upon the circumstances and the particular surroundings of each specific case. The test is that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury to another." *Montgomery Ward & Co. v. Young*, 195 Va. 671, 673, 79 S. E. 858; *Chesapeake & O. Ry. Co. v. Farrow's Adm'x*, 106 Va. 137, 55 S. E. 569; *Gardner v. Black*, 217 N. C. 573, 9 S. E. 2d 10.

The situation presented is that defendant was the owner and operator of a stockyard and slaughterhouse within the corporate

limits of a large city containing a population of 213,513, according to the 1950 census; and approximately 13,000 cattle were processed through his plant annually. The evidence tends to show that defendant knew the tendency of the Brahma breed of cattle to be easily frightened excited and wild. In addition, his employees not only knew the propensities of this breed of cattle but they saw this particular heifer jump twice over a fence more than five feet high and try to jump over another fence five feet, eight and one half inches high. They testified that they drove her back into the lane with the other cattle, hoping to calm her. This they tried the first time but it had no effect upon her. They took no additional precautions to prevent her from escaping from the stockyard. The second time she was driven out of pen 5 into the lane she had an opportunity to make a running jump over the outside gate which was only five feet, three inches tall.

Dr. Stefano Pino, a veterinary surgeon and an expert on cattle, testified that when a cow is wild and excited she is likely to jump a fence five or six feet high and that the best and most reasonable way to have calmed this heifer was to have left her in pen 5.

In 3 C. J. S., Animals, § 145, p. 1247, it is said: "The owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and in so far as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them."

"The sufficiency of the notice is a question of what is sufficient to put a reasonable and prudent man on his guard. It is not necessary that it be notice of mischief actually committed; it is the propensity to commit the mischief that constitutes the danger. And if the mischief is of a sort that animals of the kind are likely to commit at a certain season of the year—as in the case of stallions—the owner should anticipate and guard against it without any special notice or warning. The rules above laid down are applicable to the case of cattle which are accustomed to overleap or throw down the fences which are sufficient for cattle in general." 2 Cooley on Torts, 4th ed., § 266, p. 311.

As we view the case, the evidence tending to prove defendant's negligence in permitting the heifer to escape from the stockyard was sufficient to present a question for the jury.

■ Defendant's next contention is that plaintiff was guilty of contributory negligence as a matter of law.

As heretofore stated, plaintiff, an employee of Colonna Shipyard, was about his employer's business, walking along a roadway within the shipyard, when he saw the 1100 pound heifer, where she had no right to be, running straight at him. At that moment Carl Meixel was between him and the heifer, apparently ready to shoot. When Carl did not shoot and stepped aside she still running was within ten feet of plaintiff.

The applicable principle of law is that if the circumstances are such as would reasonably cause a normal person to become greatly excited or frightened, he is not required to exercise the coolness and sound judgment that he would be required to exercise under ordinary circumstances. One who negligently places another in a position of sudden peril may not complain that the other fails to react with wisdom and promptness. *Norfolk & P. B. L. R. Co.* v. *Parker*, 152 Va. 484, 147 S. E. 461; 13 Michie's Jur., Negligence, § 32, p. 547.

The above principles of law were fully set forth in three instructions on contributory negligence, two given on the request of plaintiff and one on the request of defendant. Neither litigant objected to any of these instructions and therefore they are not before us for approval or disapproval.

There is no merit in defendant's contention that plaintiff was guilty of contributory negligence as a matter of law.

■ Defendant's final contention is that the court committed error in giving certain instructions offered by plaintiff, and in refusing certain instructions tendered by him.

There are three fatal errors in plaintiff's instruction P-1.[1] First,

---

[1] Instruction P-1 reads as follows:

"The Court instructs the jury that the defendant B. Perlin in operating stockyards within the City limits of Norfolk, Virginia, owed the duty to the plaintiff as a member of the general public to maintain pens and stockyards and operate such stockyard in such a manner that would be reasonably safe for the retention of cattle, including mixed breed Brahma cattle. If you believe that the mixed breed Brahma cow that struck the plaintiff herein was permitted to get out of the confines of the defendant's stockyard because the defendant failed to exercise reasonable care in maintaining the stockyard or in operating it, then you shall find for the plaintiff.

"The jury is further instructed that if you believe from the preponderance of the evidence that after the mixed breed Brahma cow escaped that the defendant, by and through his employees, had a reasonable opportunity to kill the cow before it struck the plaintiff and failed, due to the negligence of one or more of the defendant's employees to kill such cow, then you should likewise find for the plaintiff."

it is a finding instruction which omits any reference to plaintiff's contributory negligence which is emphasized by three instructions given without objection on that subject. Second, it authorizes a finding for plaintiff on proof of mere negligence without telling the jury that the burden was on plaintiff to prove that the negligence of defendant, if any, must have been the sole proximate cause of plaintiff's injuries. Third, the last paragraph of the instruction directs the jury to find for the plaintiff if they believe defendant's employees had a reasonable opportunity to kill the heifer before she struck plaintiff. The evidence on this issue has been stated and need not be repeated. Standing alone it is insufficient to convict defendant of negligence.

Defendant's objections to instruction P-2[2] are sound. If the court intended, as it might be inferred it did, to instruct the jury on the doctrine of *respondeat superior* or principal and agent, this intention was not clearly expressed. The language, "which negligence, if any, was the proximate cause of plaintiff's injury," is tantamount to the court telling the jury that plaintiff was entitled to recover merely on proof of the negligence of defendant's employees, without proof that such negligence was the proximate cause of the injuries. 10 Michie's Jur., Instructions, § 26, p. 227. See *Walker* v. *Nickerson*, 291 Mass. 522, 197 N. E. 451.

Defendant's objection to plaintiff's instruction P-5[3] is well taken.

---

[2] Instruction P-2 reads as follows:

"You are instructed that the negligence, if any there may have been proven, of employees of defendant, which negligence, if any, was the proximate cause of plaintiff's injury, is negligence for which the defendant B. Perlin is responsible."

[3] Instruction P-5 reads as follows:

"The Court instructs the jury that if you find that plaintiff Norman Chappell is entitled to recover, you may award him such damages within the amount claimed as in your opinion will compensate him for the pecuniary damages proved to have been sustained by him and proximately caused him by the wrong complained of. In estimating the amount of such damages, you may consider the physical and mental pain suffered, if any; the nature and extent and severity of his injuries, if any; the extent, degree and character of suffering, mental or physical, if any; its duration and its severity; and loss of earning capacity, if any, and any probable future loss of earnings. You are further instructed that the law allows one injured, through the negligence of another, compensation money, not only for his physical pain and suffering but also for his mental pain and suffering.

"Mental suffering may arise out of the physical injury and depends upon the extent, character and probable duration of the injury. It includes all of the forms that mental suffering will normally take which will vary in each case with the temperament of the individual, the nature and character of his injuries, whether permanent or temporary and the mental worry, stress or grief, if any, which he may sustain thereby.

"If one be handicapped by physical injuries from performing the task incident to

The instruction is argumentative, repetitious and unduly emphasizes the element of mental suffering and is so drawn as to appeal to the sympathy of the jury. Of course mental suffering when proved or fairly inferred from injuries sustained is an element of damages, but to over-emphasize this element, as was done in this instruction, was prejudicial to defendant. 10 Michie's Jur., Instructions, § 25, p. 224.

Instruction P-6 told the jury that in determining the amount of damages to award plaintiff they should exclude from their consideration "any gratuity or special consideration, if any, being afforded the plaintiff by a third party, such as Colonna Shipyard," his employer.

The evidence on this subject is that plaintiff never lost a day from his employment. However, on account of injuries sustained to his shoulder he was not able to do the type of work he had been doing, which was fastening bolts or rivets on the inside of boilers. His employer gave him lighter work to do and paid him the same wages; indeed, his wages were thereafter increased along with those of his fellow employees. These facts were pertinent on the question of damages and, contrary to the instruction, should have been considered by the jury in determining the amount of damages sustained.

The instructions requested by defendant and refused by the court are based upon the theory that defendant was guilty of no negligence and was not liable to plaintiff for any damage sustained by him. We find no error in the refusal of the court to grant these instructions.

For the reasons stated, the judgment is reversed, the verdict of the jury set aside and the case remanded for a new trial not inconsistent with the views herein expressed.

*Reversed and remanded.*

---

his station in life and that the character of the injuries be such as to cause one mental anxiety and dread of physical suffering reasonably certain to continue in the future, you may consider such elements in assessing damages for mental suffering.

"In estimating such mental suffering, if any such exists, you may also consider whether mental suffering might be normally sustained by the plaintiff herein from the deprivation of the pleasure and satisfaction and right that only those can enjoy who are possessed by a sound body and free use of all its members. These are all proper component elements for that mental suffering for which the law entitles one injured by the negligence of another to seek redress in monetary damages."