## CIRCUIT COURT OF CAROLINE COUNTY

Dorothy M. Rowe et al.

    v.

Holly Hill Farm Corp.

May 9, 1990

Case No. CL89-118

By JUDGE WILLIAM H. LEDBETTER, JR.

The issue in this case is the constitutionality of the division fence law as applied to these plaintiffs.

The facts, found in the pleadings and by stipulation of counsel at the hearing on April 18, 1990, are not in dispute. Holly Hill Farm Corp. operates a farm in Caroline County known as "Holly Hill Farm." The plaintiffs are the owners of subdivided lots adjoining the farm. Recently, Holly Hill constructed a fence around portions of its pastureland, adjacent to the plaintiffs' lots, for the purpose of confining its livestock. Holly Hill then called upon these adjoining landowners to contribute *pro rata* to the cost of constructing the fence under Virginia's division fence law (Virginia Code § 55-317 *et seq.*). The plaintiffs here are defendants in actions brought by Holly Hill for such contributions.

Under the common law of England, landowners were obligated to keep their livestock confined within their own grounds or else they would be liable for the animals' trespasses upon the unenclosed lands of their neighbors. See discussion in *Burford v. Houtz*, 133 U.S. 320 (1889).

In early days, nearly all the colonies, territories, and states in this country repudiated or modified the English "livestock enclosure" rule. As early as 1631, Virginia adopted a fence law that provided that if a landowner did not maintain a sufficient fence around

his own land to keep livestock out, he suffered the consequences of any damage from roaming livestock; if, however, he built an adequate fence, the owner of the livestock would be liable for any damage committed by the trespass of his animals upon the enclosed lands. *See Poindexter v. May*, 98 Va. 143 (1900). So, the prevailing law of the New World, including Virginia, contrary to the common law of England, permitted livestock to run at large, and the owner of livestock had no responsibility for their going upon the lands of his neighbor unless the neighbor erected a fence, according to the statute, sufficient to protect his land from the livestock. This principle, in varying forms, exists today in most states. *See* 35 Am. Jur. 2d, *Fences* § 12 *et seq.*

Virginia's division fence law (§ 55-317 to § 55-322) provides a procedure for building, repairing and maintaining such fences. A landowner may give notice to his adjoining neighbor of his intention to build a fence between their lands and call upon his neighbor to come forward and build half of it. If the neighbor gives a return notice that he intends to let his land lie open, he will not be responsible for a share of the cost of the fence. If the neighbor does not choose to let his land lie open, he must build his half of the fence or pay for half of its costs. Further, if a neighbor who opts to let his land lie open and thereby avoid contribution to the fence should later change his mind and enclose his land, he (or his successor) will be liable for one half the value of the fence.

Similarly, when a division fence is in need of repair, a landowner may give notice to the adjoining landowner, and each will be required to come forward and repair his half or stand liable to the other for one half of the cost of such repair.

Virginia Code § 55-306 provides that once a fence is erected, the owner of livestock is liable for damage caused by his animals' trespass into the enclosed land.

Virginia Code § 55-299 defines with particularity what constitutes a lawful fence.

Any county may, by ordinance, opt out of the fence law by adopting a "no-fence law," in which the boundary of each lot or tract of land is declared to be a lawful "fence." Under such an ordinance, a law similar to the

English common law is in place, so that owners of livestock cannot allow their animals to run at large beyond the limits of their own land. Virginia Code § 55-310 to Section 55-316. Caroline County does not have such an ordinance.

These fence laws are not applicable to cities and towns where, by law, animals must be confined. *Perlin v. Chappell*, 198 Va. 861 (1957).

The plaintiffs focus upon only one aspect of this maze of fence law statutes. As noted above, a neighboring landowner who has been given notice of another's intention to build a division fence can avoid liability for any part of the cost of the fence by giving notice that he intends to allow his land to lie open. In modern times, however, the General Assembly added the following qualification: "No owner of land used for industrial or commercial purposes, *or subdivided into lots or parcels*, adjoining lands used for agricultural purposes, when given notice by the owner of such adjoining land [of his intention to build a division fence] . . . shall have the option of choosing to let his land lie open but shall build one-half of such fence or be liable therefor." (Emphasis added.)

Analyzing the statutory scheme with this qualifying proviso in mind, it is evident that an industry, commercial establishment, and subdivided lot owner *cannot* avoid liability for a share of the cost of a fence when called upon by an adjoining agricultural landowner. Who, then, may take advantage of the option of choosing to let his land lie open? Obviously, only owners of agricultural land are within the favored class.

There is a strong presumption in favor of constitutionality of all legislative enactments, including legislation that creates classifications. That is especially true when the legislation involves economic classification rather than classifications based on race, sex, national origin, or similar "suspect classifications" which bear stricter scrutiny under the Equal Protection Clause of the federal Constitution.

Despite these presumptions of constitutionality and reasonableness, a legislative enactment cannot pass muster if it constitutes "special legislation" violating Article IV, Sections 14 and 15, of the Constitution of Virginia. When called upon to do so, it is the duty of the courts, proceeding with deference and circumspection, to strike

down those laws which clearly crate improper, arbitrary, and artificial separations of persons, places, or things so that some of them will and others of them will not be affected by the law. *See Martin's Executors v. Commonwealth*, 126 Va. 603 (1920).

In *Riddleberger v. Chesapeake Western Ry.*, 229 Va. 213 (1985), the Court, quoting *Martin's Executors*, said:

> In order for classifications to be permissible, there must be some such difference in the situation of the subjects of the different classes as to reasonably justify some variety of rule in respect thereto. Though an act be general in form, if it be special in purpose and effect, it violates the spirit of the constitutional prohibition.

The plaintiffs' challenge to § 55-317 and § 55-318, as applied to them, is based on this prohibition against special laws in paragraph IV of their motion. Because they have no option regarding contributions to a division fence built by an adjoining agricultural landowner, whereas agricultural landowners do, they contend that they are victims of an unreasonable legislative classification.

In proceeding with a special-laws analysis, the court must turn to the tests of constitutionality explained in decisional law. Does the provision affect all persons similarly situated or engaged in the same activity without discrimination? Here, the answer is obviously no. The law benefits only owners of agricultural land, enabling them to avoid the rigors of the statute by choosing to let their lands lie open, while it expressly withholds that benefit from other landowners. Does the provision, as applied, bear a reasonable and substantial relationship to the object sought to be accomplished by the legislature? The object of the division fence law is the same as it was three and a half centuries ago: to provide a means by which a landowner may enclose his property and shift liability for damage caused by roaming livestock to the owner of such livestock. The object of the particular provision in question is to provide a means by which a landowner wishing to enclose his land can obtain contributions from an adjoining neighbor who would benefit from

the fence, but to exempt one who decides that he does not need the fence because he intends to let his land "lie open." Plainly, the statutory provision which is the subject of this inquiry bears no reasonable relationship to that objective. It enables only owners of agricultural land to choose not to share in the cost of an adjoining landowner's fence; everyone else must bear the expense, whether they want to or not, whether they need it or not, and, most importantly, whether they desire to have their lands open or enclosed.

The oppressive and unreasonable impact of the statutory provision is well illustrated by this case. Holly Hill, operator of a large farm, wished to enclose its pastureland in order to graze livestock there. It constructed a fence for that purpose. It now intends to recoup one half of the cost of that fence, which is considerable, from adjoining owners of subdivided lots who neither need nor want the fence. They prefer that their lands lie open. If Holly Hill's cattle wander upon their lands, they are willing to suffer the consequences, aware that they would have no remedy against Holly Hill. However, because they are owners of subdivided lots, and for no other reason, they cannot choose to allow their lands to lie open. They are compelled to contribute to the cost of Holly Hill's fence. Such a result stands the fence law on its head. Rather than provide a landowner with the option of enclosing his land against intruding livestock, thereby shifting liability for damages to the livestock owner, or accepting the risk of damage from livestock trespass that accompanies non-enclosure, the law is used in this case to aid the operator of a large farm who wants to build a fence for his cattle and to charge half of that expense to those around him who neither need it nor want it.

Holly Hill relies upon *Poindexter v. May, supra,* in support of its position that the fence law is constitutional. In *Poindexter,* the Supreme Court of Virginia dismissed a facial attack upon the fence law. "We entertain no doubt of the validity of the laws under consideration," the Court said.

> They were intended for the mutual benefit, convenience, and welfare of all the citizens of the Commonwealth . . . . They provide a reason-

able protection for the rights of owners of enclosed land and limit the right of redress for trespass to those injuries which do not result from their own non-compliance with the law. The legislature has the power to regulate the relative rights and responsibilities of the proprietors of enclosed land and the owners of stock that is allowed to run at large and can, therefore, take from every man his remedy for a trespass by cattle, unless he encloses his lands with a lawful fence . . . .

First, *Poindexter* did not involve the fact situation presented here. In that case, an orchard owner sought relief against intruding livestock of an adjoining landowner. He argued that he should not have to put up a fence to keep his neighbor's cattle and horses out of his orchards and that Virginia's long-standing rule to the contrary was invalid. Because nearly every state in the country had similar laws rejecting the English common law rule, the Court found no merit to the orchard owner's argument. Clearly, the state legislature can alter or repudiate the common law of England on a particular point where the differences in lifestyles, customs, and geography call for it, so long as the new law applies to *"every man"* and does not arbitrarily single out a particular group or class to favor or to burden. Second, *Poindexter* involved a challenge to the facial validity of the entire statutory scheme of fence law, not to one provision of it as applied to a certain group or class. Third, and most important, the *Poindexter* decision did not address, or even make reference to, the particular provision of the statute challenged here because it was not a part of the statutory scheme at the turn of this century. The provision challenged in this case, which radically altered the fence law so that its effect does not apply to "every man," was added after *Poindexter*.

The recent case of *Choquette v. Perrault* (Vermont Supreme Court No. 86-335, March, 1989) is instructive. There, the Vermont court concluded that requiring an adjoining landowner who does not keep livestock to share the cost of a fence for the benefit of a neighbor "is not reasonably necessary to any legitimate purpose and

is oppressive." That court observed that "the police power as applied to defendants does not today legitimately further the statute's purpose of clarifying the obligations and liabilities of adjoining landowners with respect to their livestock." The court declared Vermont's fence law, similar to Virginia's, unconstitutional when applied to landowners without livestock. The court cited with approval *Sweeney v. Murphy*, 334 N.Y.S.2d 239 (1972), *affirmed* 294 N.E.2d 855 (1973), which struck down the New York fence law.

This court does not, and need not, adopt the sweeping rationale of the Vermont and New York appellate courts. Instead, the narrower analysis in *Benderson Development Co. v. Sciortino*, 236 Va. 136 (1988), which struck down Virginia's Sunday closing laws, governs this analysis. The tests of constitutionality of laws challenged as special laws, discussed above, are derived from *Benderson*, which in turn quoted from *Mandell v. Haddon*, 202 Va. 979 (1961). Furthermore, in *Benderson*, the Court declared:

> [G]eneral laws may be rendered special in their application by a combination of several factors, of which legislative amendment may be one. Because the power of judicial review is the only protection which exists against legislation which has become unconstitutional as applied, our role is not limited to examining the effect of legislative amendments. When the application of a law is fairly challenged under the Constitution, it is our duty to examine its actual effect upon those subject to it, *regardless of the origin of the factors which combine to produce that effect* . . . . (Emphasis added).

By amendment, the passage of time, and the changing land use patterns and mores of Virginia society, the effects of the opt-out provisions of § 55-317 and § 55-318 are unreasonable and oppressive when applied to these plaintiffs. They are beneficial to only one class of landowner, the agricultural landowner, in an arbitrary and artificial manner that bears no fair resemblance to the object or purpose of the law. The amendment which precludes subdivided lot owners from choosing to opt out is an especially strong factor that, combined with others, produces the effect

of an unreasonable classification in violation of the special-laws prohibition. This court need not decide whether industrial and commercial users may be treated specially, but there is no rhyme or reason for special discriminatory treatment of a landowner simply because his land is "subdivided." The owner of a subdivided lot or parcel may or may not be in possession of his property. He may or may not be using it for any purpose that would be potentially harmful to roaming livestock, or for any other purpose. The lot or parcel may be farmed or in timber, albeit subdivided, or it may be improved by a single-family residence on several acres of wooded or open land. He may or may not want his property enclosed. He cannot be singled out from his neighbors, who live on "unsubdivided" parcels but whose use of their land may be identical to his, and compelled to do that which others similarly situated are not required to do.

Accordingly, the court is of the opinion that the opt-out provision of the division fence law, as applied to owners of subdivided lots, is special legislation and is therefore unconstitutional.

The relief sought in the motion for declaratory judgment will be granted. The actions instituted by Holly Hill against the plaintiffs here will be removed from the trial docket.