**VIRGINIA ACADEMY OF CLINICAL PSYCHOLOGISTS et al.**

v.

**BLUE SHIELD OF VIRGINIA et al.**

Civ. A. No. 78–0496–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

April 9, 1979.

Warwick R. Furr, II, Lewis, Mitchell & Moore, Vienna, Va., Timothy J. Bloomfield, Dunnells, Duvall, Bennett & Porter, Washington, D. C., for plaintiffs.

R. Gordon Smith, McGuire, Woods & Battle, Richard L. Williams, Gilbert E. Schill, Jr., James H. Walsh, Richmond, Va., for Blue Shield of Va.

Ronald M. Ayers, Heman A. Marshall, III, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for Blue Shield of Southwestern Va.

Joel I. Klein, Rogovin, Stern & Huge, Washington, D. C., Francis J. Prior, Jr., Siciliano, Ellis, Sheridan & Dyer, Arlington, Va., for Neuropsychiatric Society of Va.

## MEMORANDUM

WARRINER, District Judge.

This anti-trust action has been brought by the Virginia Academy of Clinical Psychologists (VACP), the professional organi-

zation of registered clinical psychologists in Virginia, and a practicing clinical psychologist, Dr. Robert J. Resnick, against Blue Shield of Virginia (BSV), Blue Shield of Southwestern Virginia (BSSWV), and the Neuropsychiatric Society of Virginia (NSV). The action is brought pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and the plaintiffs are seeking injunctive relief pursuant to 15 U.S.C. § 26.

The gravamen of plaintiffs' complaint is that the practice of defendants, allegedly a result of a conspiracy amongst the defendants, of paying the fee of clinical psychologists for out-patient psychological services rendered to subscribers of Blue Shield only when these services are ordered by, supervised by, and billed through a physician, amounts to a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.

As it is admitted that the policy complained of exists, the question for decision is whether it was the result of a contract, combination, or conspiracy and if so, whether such practice is a restraint of trade in violation of the Sherman Act. In view of the applicability of the McCarran-Ferguson Act to the medical insurance contracts in question here, the additional issue of whether the practice complained of amounts to a boycott will be considered.

The Court, in its previous rulings on defendants' motion to dismiss and motion for summary judgment, has ruled that plaintiff VACP and plaintiff Resnick have standing to pursue this action. The Court has also ruled that plaintiffs are not guilty of laches and that it would not be appropriate to stay this action due to the pending State Corporation Commission proceedings. *See* memorandum opinion of Court filed 10 October 1978 and memorandum opinion and order of Court filed 13 November 1978.

■ A conspiracy in restraint of trade that is solely intrastate with no effect on interstate commerce is not prohibited by Section 1 of the Sherman Act, 15 U.S.C. § 1. In a carefully reasoned opinion, the Third Circuit held that where a restraint on commerce decreases the amount of out-of-state

equipment and supplies bought by the complainants, such a restraint is affecting interstate commerce and is thus prohibited by the Sherman Act. *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 50–54 (3rd Cir. 1973).

■ In this case, there is testimony that plaintiff Resnick and other members of the VACP buy substantial amounts of out-of-state equipment and supplies and treat out-of-state patients. The amount of equipment and supplies bought by clinical psychologists decreases when their business decreases and since the complained of policy is shown to adversely affect plaintiffs' business, the Court holds that the policy has an effect on interstate commerce, as explained in *Doctors.*

Defendant BSV and defendant BSSWV exist pursuant to a Virginia statutory scheme for pre-paid health care plans. Va. Code § 32–195.1 *et seq.* (1973 Repl.). BSV is authorized by the State Corporation Commission to operate throughout most of the Commonwealth east of the Blue Ridge Mountains, except for a small area in Northern Virginia. BSSWV is authorized by the State Corporation Commission to operate in Southwest Virginia. The plans were organized in the 1940s by medical doctors as a way of guaranteeing payment for provided medical services rendered by them to their subscriber-patients.

Defendant NSV is a not-for-profit non-stock corporation whose members are psychiatrists-physicians who practice in Virginia. It is the professional organization of Virginia psychiatrists.

Plaintiff VACP is the professional organization of clinical psychologists in Virginia. Clinical psychologists, including plaintiff Resnick and members of the VACP, are licensed as practitioners of "the healing arts" by the Virginia State Board of Medicine. Va.Code § 54–274 (1978 Repl.). In order to apply for a license as a clinical psychologist, a candidate must have a Ph. D. degree in clinical psychology and must have at least two years of approved supervised clinical experience, one of which must

be post-doctoral. The candidates are then given written and oral examinations by the Virginia Board of Psychology, and if they pass those examinations, the Board recommends to the Virginia State Board of Medicine that they be licensed. It is the Virginia State Board of Medicine which actually issues the license and subsequently regulates and monitors their activities.

Since about 1962 major medical plans issued by the two Blue Shield defendants have included coverage for mental and nervous disorders and for psychotherapy as a method of treating those disorders. Since about 1972, defendant BSV has reimbursed a patient for psychotherapy rendered outside a hospital only if he is treated by a psychiatrist or if he is treated by a clinical psychologist upon reference to and supervision by a physician with the psychologist's services billed through the physician. BSSWV has followed such policy since its inception in 1945 with certain exceptions noted hereafter.

Virginia law licenses both psychologists and psychiatrists to perform psychotherapy, Va.Code § 54–273 (1978 Repl.). Plaintiffs' complaint is that the policy of the Blue Shield defendants, allegedly arrived at by combination or conspiracy, of reimbursing patients who are treated by psychiatrists for psychotherapy but only reimbursing patients who are treated by clinical psychologists if the additional requirement of physician billing, supervision, and referral are met, adversely affects plaintiffs' competitive position as a result of a conspiracy in restraint of trade.

Plaintiffs allege that in addition to the parties defendant, the Medical Society of Virginia, Blue Cross of Virginia, and Blue Cross of Southwestern Virginia are part of this cooperative undertaking in restraint of trade. These latter entities are not named as defendants. Unlike Blue Shield plans, Blue Cross plans deal solely with hospital costs and in-patient services. Plaintiffs acknowledged at trial that clinical psychologists are not capable of rendering in-patient psychotherapy in competition with psychiatrists in the absence of physician supervision. Thus only out-patient care is in contention in this case.

The Court will first address the issue of whether BSV and BSSWV have combined or conspired together in restraint of trade.

## I

Defendant BSSWV now directly reimburses patients for psychologists' out-patient services if the definition of "physician" in the subscriber's contract includes "psychologists." Such a definition is contained in approximately 75 per cent of the current contracts issued by BSSWV. Nervous and mental disorders are covered only in major medical contracts and in more than 90 per cent of these contracts the definition of "physician" includes "psychologists."

■ BSSWV has always opposed the payment of psychologists directly but has agreed to direct payment in most of its contracts, as noted above, because the Bureau of Insurance of the State Corporation Commission had disapproved the form of a major medical contract submitted which did not include "psychologists" in the definition of "physician."

This disapproval by the Bureau of Insurance followed the enactment of Va.Code § 32–195.10:1 (Supp.1978) by the General Assembly in 1973. This section is interpreted to require that psychologists, among others, must be reimbursed directly for covered services by prepaid health care plans where they are rendering services that they are licensed to perform.[1] Unbeknownst to the Board of Directors of BSSWV the contract language was changed by subordinate officials of BSSWV to meet the Bureau's objection. When the Board of Directors subsequently learned of the change inserted in their contracts, the Board decided to honor the provision but at the same time reiterat-

---

1. It is the constitutionality of this statute that is at issue in the State Corporation Commission proceeding mentioned above.

ed its opposition, as a matter of principle, to direct payment to unsupervised clinical psychologists.

Collaboration between BSSWV and BSV concerning the issue of payment to clinical psychologists has revolved in the main around the challenge in State tribunals to the Virginia statutory scheme requiring such direct payment. BSSWV and BSV sought to bring a declaratory judgment action in the State court. Then it was decided, in consultation with counsel for VACP, that a suit by a patient who was not reimbursed for the services of a clinical psychologist would be the best means of challenging the statute. This test case was filed but was subsequently non-suited at the instance of VACP. Finally, BSV brought the matter before the State Corporation Commission where it is pending or from which it is being appealed.

Though BSSWV is not now directly participating in the State legal actions, its collaboration with BSV cannot afford a basis for a Sherman Act suit since the activity is protected by the First Amendment. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington,* 381 U.S. 657, 669–670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Rr. President's Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

▆ The only other joint activity between BSSWV and BSV centered around their participation in various national accounts, including the Commonwealth contract, the major medical insurance plan for employees of the Commonwealth. The Commonwealth contract involves defendant BSV, defendant BSSWV, and the Medical Service of the District of Columbia. BSV negotiated the contract with the Commonwealth, receives the premium paid by the Commonwealth, maintains subscriber records, and controls the administration of the contract. Defendant BSSWV did not participate in the negotiations, does not receive any direct payment from the Commonwealth, and does not exercise any control over the administration of the contract. Other than a requirement by the Commonwealth that all three Blue Shield organizations sign the contract, this contract is similar to other national accounts.

In a national account the "control" Blue Shield organization negotiates the contract and determines the benefits available and rate to be paid for those benefits. Other plans, known as participating plans, act as agents for the control plan in administering the claims of subscribers who are members of the subscribing group residing in the service area of the participating plan. The participating plan makes payment only for those benefits covered by the contract between the control plan and the group. These national accounts exist to accommodate to the difference between a covered group's geographic dispersion and the specific territories assigned Blue Shield organizations by State regulatory agencies. Thus when there is a contract with a group whose beneficiaries reside in more than one Blue Shield area, national account coverage is provided.

National accounts require cooperation among participating Blue Shield organizations. The Commonwealth contract and the other national contracts require just such cooperation between the two Blue Shield defendants. It is State law which divides the service areas and which thus compels the two Blue Shield defendants to cooperate in order to provide service throughout the Commonwealth. Such State regulatory activity is at the heart of the State action exemption to the anti-trust laws enunciated in *Parker v. Brown,* 317 U.S. 341, 350–1, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364, 383 (1977) it is stated "that the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign." The cooperative activities of the two Blue Shield defendants in servicing national accounts is conduct made necessary by the State as sovereign. It is only the sovereign which regulates by force of law, and it is

State law that divides the Commonwealth into service areas thus forcing the Blue Shield defendants to cooperate on national accounts. The Court thus concludes that the national accounts, including the Commonwealth contract, in which both Blue Shield defendants are participants, are joint activity and contractual arrangements exempt from the Sherman Act by reason of the State action exemption.

In any event, this cooperation or combination is not that which plaintiff decries and it is not shown to be in restraint of trade.

## II

There is no evidence that defendant NSV acted in conjunction with defendant BSSWV in establishing the clinical psychologist payment policy. Plaintiff does not seriously so contend. The main thrust of plaintiffs' case is that such a combination or conspiracy existed between NSV and BSV. A review of the live testimony, the documentary evidence, and the deposition extracts convinces the Court that this corporate policy of BSV was promulgated by the management and the Board of Directors of BSV after consultation with various provider groups, including groups representing psychologists and psychiatrists. The final decision, however, to adopt the policy was made solely by BSV's policy making bodies.

BSV had been inconsistent in its policy during the 1960's and early 1970's in regard to payment of clinical psychologists. There is evidence that clinical psychologists had been paid for services independently rendered and yet it is not clear that this was company policy. Instead it appears that it resulted from a lack of company policy. In any event, the explosion of claims for nervous and mental disorders which occurred in the late 1960's came to the attention of the then new president of BSV, Alden Flory, and in 1971 it was decided that policy controls were needed.

In determining what should be the proper coverage for nervous and mental disorders the staff of BSV was instructed to secure the views of the various provider groups.

Among those consulted were the Medical Society of Virginia, the Virginia Psychological Association, NSV, representatives of the Virginia Institute of Pastoral Care, psychiatric social workers, psychiatric nurses, and others. Although plaintiff VACP was not a separate entity at the time, the views of clinical psychologists were expressed through the Virginia Psychological Association.

NSV closely cooperated with BSV and gave assistance to BSV as it formulated policies in regard to who should be paid for providing mental health care, how much they should be paid, when they should be paid, and for what they should be paid. On 3 March 1971, L. W. Hulley, Jr., M.D., the head of BSV's professional relations committee met with R. Terrell Wingfield, M.D., President of NSV. Over the next year there was a substantial amount of communication between the two organizations. On 19 May 1971 at Blue Shield's corporate headquarters, a special committee of NSV met with representatives of BSV and discussed a large number of items dealing with payment to psychiatrists and clinical psychologists. A second meeting was held on 9 June 1971 at Tucker Hospital in Richmond. An extensive survey of Virginia psychiatrists, including those who did not belong to NSV, regarding psychiatric practice was provided BSV by NSV. The insurance committee of NSV met with representatives of defendant BSV. The day before the adoption of BSV's interim corporate policy on 22 February 1972, the policy which set the general guidelines as to payment, representatives of BSV had met with representatives of NSV.

These committee meetings were working meetings and the officials of NSV were of substantial assistance to the officials of BSV in formulating the policy at issue in this lawsuit. Defendant NSV notes that the report of its committee was never officially adopted by the membership of NSV but instead it was referred to the President of NSV for further work. It is also true that not all of defendant NSV's recommendations were adopted by defendant BSV.

Additionally, NSV points out that it took no position on the bill passed by the General Assembly mandating direct payment to psychologists. But this in no way detracts from the fact that NSV and BSV cooperated closely in 1971 and 1972. There is also no question that the two entities concurred that clinical psychologists should be paid for psychotherapy only when rendered under the supervision of a physician. The question for the Court is whether this cooperation amounted to a "contract, combination in the form of trust or otherwise, or conspiracy" according to the language of Section 1 of the Sherman Act, 15 U.S.C. § 1.

As pointed out above, BSV also consulted with representatives of other provider groups. It was only after all such consultation that the management and Board of Directors of BSV decided that as only medical doctors could ultimately determine the medical necessity of treatment for nervous and mental disorders, clinical psychologists would only be reimbursed for services rendered where there was referral to, supervision by, and billing through a medical doctor.

Though prior inquiry, consultation, and negotiation clearly took place, no contract was entered into, no combination was formed, and no conspiracy existed. Section 1 of the Sherman Act does not prohibit a business entity which needs information and advice from obtaining information and advice from other knowledgeable business entities. The operation of a medical insurance plan would be, for all practical purpose, impossible if consultation and cooperation with provider groups were barred.

■ The problem of what constitutes a "contract, combination in the form of trust or otherwise, or conspiracy" has continually confronted the Courts. In *United States v. Standard Oil Co.*, 316 F.2d 884, 896 (7th Cir. 1963), where 11 corporate defendants, all oil companies, were appealing their convictions of conspiracy to raise retail gasoline prices, the Court held that there can be no conspiracy where there is no conscious commitment to a common scheme. The Court noted that "certainly, any defendant which

heard of Standard's price announcement was not thereby immobilized and precluded from acting in a normal fashion as its interests might dictate so long as it was not pursuant to an understanding or agreement." *Standard Oil*, 316 F.2d at 896. Similarly, BSV's decision to implement its policy on payment to psychologists does not become a conspiracy with NSV because both took essentially the same position. On the reasoning of *Standard Oil*, BSV is not liable for conspiracy for acting as its interests dictated because BSV's decision was an independent one.

■ Additionally, in contrast to the instant case, the parties who acted in *Standard Oil* were competitors. And it is against competitors that the strictures of the anti-trust laws most stringently apply. *See Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3rd Cir. 1973); *Joseph E. Seagram Sons, Inc. v. Hawaiian Oke Liquors, Ltd.*, 416 F.2d 71, 78 (9th Cir. 1969), *cert. den.* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

In *Scranton Construction Co. Inc. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974), *cert. den.* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975) the Court confronted a situation where defendant Litton engaged in rather unsavory business dealings for the express purpose of assuring that defendant United Cement received a certain subcontract on a construction project. Plaintiff, an unsuccessful bidder against defendant United Cement, alleged a conspiracy under the anti-trust laws between defendant Litton and defendant United Cement but the Court held that the independent business decisions of defendant Litton, though helpful to defendant United Cement, were not the bases of a combination or conspiracy. *Scranton Construction*, 494 F.2d at 782–83. So here, the independent business decision of BSV, though arguably helpful to NSV, does not form the basis of a combination or conspiracy with NSV.

■ In sum, NSV cooperated closely with BSV by urging BSV to adopt the policies in

question and by advising BSV on their implementation. But this does not amount to a "contract, combination . . . or conspiracy" as used in Section 1 of the Sherman Act. *Scranton Construction Co.; Standard Oil Co.*

### III

Even if it be found that the above activity amounts to an illegal contract, combination or conspiracy, the question of whether it operated in restraint of trade needs to be addressed for it is only those contracts, combinations and conspiracies "in restraint of trade or commerce" that are prohibited by Section 1 of the Sherman Act.

NSV first contends that all its activity amounts to no more than taking a position on a matter of public interest and it is thus protected under the First Amendment. That question need not be dealt with at length because the private meetings between the representatives of defendants NSV and BSV which discussed the range of psychiatric benefits, who was to provide them, and who was to be paid for them, were not equivalent to taking a position on a matter of public interest. Though infected with a public interest, this was not the expression of a viewpoint concerning the provision of health care in a public forum. These were private consultations and working sessions where implementation of defendants' corporate policy was discussed. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

The question remains, assuming the conspiracy, whether the policy is in restraint of trade. In approaching this question, the Court is mindful of the rule, recently reiterated in *Continental T.V. Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49 n.15, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) that anti-trust cases must be read in their factual context.

The starting point in deciding the proper factual context for this case is deciding what sector of the economy is affected. Once the Court has identified the proper sector it can analyze whether defendants' actions have endangered competition within that sector. In other words, the Court looks to see who is competing with whom so as to understand whether defendants' actions restrain trade to the detriment of plaintiffs. *Cf., John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 498–9 (9th Cir. 1977); *In re Multi-district Vehicle Air Pollution,* 481 F.2d 122, 126 (9th Cir. 1973); *G.A.F. Corp. v. Circle Floor Co., Inc.,* 463 F.2d 752, 757 (2nd Cir. 1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973).

The fundamental premise of plaintiffs' case is that clinical psychologists are equal providers of therapy, in particular psychotherapy, with psychiatrists. It is true that both psychologists and psychiatrists professionally render psychotherapy to patients. But in the treatment of nervous and mental disorders, psychiatrists are capable of providing a full range of psychiatric treatments, not just psychotherapy. In addition, as medical doctors psychiatrists may render medical treatment and diagnosis. It is undisputed that clinical psychologists are not qualified to diagnose nervous and mental disorders and to decide from what source these disorders stem. What appears to be a nervous or mental condition is often the result of a physical illness or disturbance which a psychiatrist is qualified and licensed to analyze but which a clinical psychologist is not. Plaintiffs themselves acknowledge that the best practice for clinical psychologists to follow before psychotherapy is referral to a physician for a physical examination. This is unanimously agreed to be necessary so as to rule out a physical cause of the nervous or mental problem. Psychotherapy is to a substantial extent useless if the disease has a physical etiology.

It is also undisputed that the only method of making sure that a physical disorder does not complicate treatment by a clinical psychologist is regular contact between the psychologist's patient and a medical doctor. Whether this be called supervision, or referral on a regular basis, the medical necessity for this practice, in most, if not all cases, is undisputed.

It thus appears that the clinical psychologist is not competitive with the psychiatrist in regard to the treatment of nervous and mental disorders unless the clinical psychologist is working under the supervision of a medical doctor. The competition, then, is, on the one hand, between the clinical psychologist working with a medical doctor and, on the other hand, the psychiatrist working alone. In this light, defendant BSV and defendant BSSWV treat the two competing entities equally so long as they both are shown to be providing medically necessary treatment. There is an exception to this equality of treatment. Clinical psychologists must submit their statement of fee to Blue Shield via the supervising physician.

The Court can well understand that plaintiffs do not like to bill through a physician as a matter of professional pride. The evidence shows that billing through a medical doctor is a requirement of the Blue Shield plan as a means of ascertaining that the treatment given and billed for was medically necessary. This procedure also tends to promote contact between the clinical psychologists and the physicians at all stages of the treatment, and thus enhances the supervisory process.

Plaintiffs, admitting the efficacy of referral and supervision, have not come forward with another plan that would be as economically and medically efficient. Indeed, Dr. William Dunn, then president of VACP, wrote the president of defendant BSV following a meeting on 14 October 1976, that "the arguments that you and your staff have tendered in defense of your position we recognize not only to be sound, but from a business point of view, virtually inevitable." On the facts presented, the Court concurs in this view.

If one group of providers, equal in rendering service with a second group, were suing the other group of providers and the Blue Shield defendants because the Blue Shield defendants reimbursed subscribers who receive services from the second group but not the first, and such policy arose from a combination, contract or conspiracy, then a restraint of trade might well be stated. *Proctor v. State Farm Mut. Auto. Ins. Co.,* 182 U.S.App.D.C. 264, 277–8, 561 F.2d 262, 275–6 (1977), *vacated and remanded on other grounds,* —— U.S. ——, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979). But that is not this case. The medical necessity of supervision and referral along with the economic necessity of billing through a physician render this situation substantially different. Here, it is only within these conditions that the plaintiffs can render services competitive with psychiatrists. And with these conditions met, the defendant BSV treats plaintiffs without any competitive disadvantage. Without these conditions met, the clinical psychologists are not rendering a competitive service and and thus defendant's policy is not illegally restraining plaintiffs in their trade.

■ As a final plea plaintiffs contend that even though the medical necessity of referral and supervision is not contested, the billing procedures cannot be defended on the basis of business necessity nor as a required check on medical necessity since other Blue Shield plans (including defendant BSSWV) and other health insurance companies do not require such procedures. Those cases are not before the Court. The billing procedures in the instant case are a reasonable means of accomplishing the end of assuring medical necessity and meeting business necessity. As there is no evidence before the Court that those goals are as adequately met by the procedures used by other Blue Shield plans the fact that other Blue Shield plans use different methods is of no moment.

The Court has held, then, that defendants have engaged in no contract, combination or conspiracy and that the policies complained of are not in restraint of trade. Thus there is no violation of Section 1 of the Sherman Act.

IV

■ Considering the fact that the trial of this case revolved almost wholly around plaintiffs' contention that defendants' conduct amounted to a boycott, and consider-

ing the fact that if the Court has erred in its holding that there is no Sherman Act violation the question arises whether the questioned activity, if not a boycott, is exempt from the prohibitions of the anti-trust laws by the McCarran-Ferguson Act, 15 U.S.C. 1012(b).

McCarran-Ferguson partially exempts from the anti-trust laws "the business of insurance" to the extent such business is regulated by state law. The core of the business of insurance has been held to be "the relationship between the insurance company and the policyholder." *S.E.C. v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 569, 21 L.Ed.2d 668 (1969).

■ The question of what is the "business of insurance" for McCarran-Ferguson Act purposes has recently arisen in the context of Blue Shield plans in *Group Life & Health Insurance Co. v. Royal Drug Co., Inc.,* —— U.S. ——, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). There the question for decision was whether contracts between participating pharmacies and Blue Shield of Texas which set the price for drugs sold by the pharmacies to Blue Shield subscribers were within the business of insurance exemption of the McCarran-Ferguson Act. The Court held that contracts between Blue Shield and providers, there the participating pharmacies, were not the business of insurance and thus were not exempt from anti-trust scrutiny.

The contracts in question here are not between providers and Blue Shield but between subscribers and Blue Shield. These provisions define what medical services are covered in the contract and thus are at the core of the business of insurance.

Dicta in *Royal Drug,* —— U.S. at —— ——, 99 S.Ct. at 1079, might be interpreted to indicate that Blue Shield organizations are· wholly outside the business of insurance. The Court's discussion in *Royal Drug* is in the context of whether Congress. considered Blue Shield plans to be engaged in the business of insurance when it passed the McCarran-Ferguson Act.

Directly on point, however, is the footnote in *Royal Drug,* —— U.S. at ——, n.37, 99 S.Ct. at 1082, n.37: "This is not to say that the contracts offered by Blue Shield *to its policyholders,* as distinguished from its provider agreements with participating pharmacies, may not be the 'business of insurance' within the meaning of the Act." (Emphasis added.) This tentative exception coupled with the definition of the business of insurance in *National Securities,* leads this Court to hold that Blue Shield subscriber contract provisions concerning covered treatment for mental and nervous disease are partially exempt from anti-trust scrutiny by the McCarran-Ferguson Act.

V

■ The McCarran-Ferguson Act only provides partial exemption as it reads in part: "Nothing contained in this chapter [15 U.S.C. § 1011 *et seq.*] shall render the said Sherman Act [15 U.S.C. § 1 *et seq.*] inapplicable to any agreement to boycott, coerce, or intimidate." 15 U.S.C. § 1013(b). Plaintiffs do not claim coercion or intimidation but, as noted, the main thrust of plaintiffs' case centered around the claim that defendants' activity amounted to a boycott.

Just recently the Supreme Court decided a conflict among the Circuit Courts of Appeal as to the definition of boycott in the McCarran-Ferguson Act. *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 549, 98 S.Ct. 2923, 2934, 57 L.Ed.2d 932, 946 (1978) holds that the definition of boycott for McCarran-Ferguson Act purposes is the same as a boycott under the general anti-trust laws. It· rejected the narrower reading that the boycott exception was meant only to apply to " 'blacklists' of insurance companies or agents by other insurance companies or agents." *Barry,* 438 U.S. at 536, 98 S.Ct. at 2927, 57 L.Ed.2d 938, n.5. In the same footnote, the Supreme Court noted with apparent approval that the Fourth Circuit and the D.C. Circuit had previously adopted the broader reading of the definition of boycott. The Court will now consider the defendants' conduct in this case in light of the two cited circuit

court decisions which adopted the broad view.

In *Ballard v. Blue Shield of Southern W.Va., Inc.,* 543 F.2d 1075 (4th Cir. 1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977), it was alleged that the defendant Blue Shield corporations of West Virginia refused to deal on any terms with chiropractors. The Fourth Circuit ruled on appeal from the granting of a motion to dismiss that this concerted refusal to deal on any terms alleged a boycott under the McCarran-Ferguson Act. Such a refusal to deal does not exist in the instant case. There cannot be a refusal to deal when plaintiffs' complaint is that the terms on which they are dealt with are disadvantageous. Although *Ballard* might be seen as merely an exclusion from coverage, the Fourth Circuit, on an appeal from a dismissal, accepted the allegations to state a classic boycott case. Plaintiffs' complaint in this case is in regard to conditional coverage given to defendants' subscribers.

The other case cited by the Supreme Court was *Proctor.* In *Proctor,* 182 U.S. App.D.C. 277–78, 561 F.2d at 275–76, Judge McGowan analyzed the term "boycott" in the McCarran-Ferguson context. Judge McGowan was dealing with a situation where it was alleged that defendant insurance companies would reimburse policyholders for automobile repairs if certain repair shops were used but not if other repair shops were used. *Proctor* held that placing conditions on the use of repair shops by the policyholder was not an unconditional or unreasonable refusal to deal and thus did not amount to a boycott.

The line drawn between Judge Butzner in *Ballard* and Judge McGowan in *Proctor* appears to be that an unconditional refusal to deal or a refusal to deal except on unreasonable terms can amount to a boycott but a conditional refusal to deal, where the conditions are reasonable, does not amount to a boycott under McCarran-Ferguson. The facts in the instant case clearly fall in the latter situation. Defendants deal with clinical psychologists but only when their services are a result of referral and supervision and when the bill is forwarded to Blue Shield via the supervising physician. The Court has previously analyzed these requirements and finds them medically and economically necessary and reasonable. This Court believes, then, that the decision herein does not offend *Ballard* and is sanctioned by *Proctor.*

Thus it appears that the McCarran-Ferguson exemption is applicable, that the activity is not a boycott, and that even if it would otherwise be illegal activity under the Sherman Act, McCarran-Ferguson removes any legally enforceable right plaintiffs might have had.

For the foregoing reasons, judgment will be rendered for defendants.

An appropriate order shall issue.