## Staunton

BLUE CROSS OF VIRGINIA v. COMMONWEALTH OF VIRGINIA, AT THE RELATION OF THE STATE CORPORATION COMMISSION.

September 4, 1970.

Record No. 7334.

Present, All the Justices.

*William H. King; A. E. Dick Howard (McGuire, Woods and Battle,* on brief), for appellant.

*Charles W. Laughlin, Special Counsel (Andrew P. Miller, Attorney General; Anthony F. Troy, Assistant Attorney General; A. Grey Staples, General Counsel, State Corporation Commission; Christian, Barton, Parker, Epps & Brent,* on brief), for appellee.

GORDON, J., delivered the opinion of the court.

By an order entered May 5, 1969, the State Corporation Commission disapproved contracts that are an integral part of the Blue Cross of Virginia prepaid drug plan. The Commission disapproved those contracts, under which cooperating pharmacists supplied prescription drugs to Blue Cross[1] subscribers, on the grounds that: (I) The contracts violate Virginia law by calling for direct payments by Blue Cross to the pharmacists. (II) The contracts violate Federal and State antitrust laws by fixing drug prices.[2] On this appeal by Blue Cross from the May 5, 1969 order, we must decide whether the Commission's action was justified on either ground.

A Virginia statute authorizes Blue Cross to conduct, as agent for participating hospitals, "a plan or plans for furnishing prepaid hospital and similar or related services". Va. Code Ann. § 32-195.1

---

[1] References to "Blue Cross" are to Blue Cross of Virginia, a non-stock Virginia corporation, unless the context indicates otherwise.

[2] The Commission's decision apparently had another basis, mentioned *infra,* p. 192.

(1969), note 7 *infra*. Blue Cross is agent for about 55 participating hospitals serving part of western Virginia and all of central and eastern Virginia except the Fairfax-Arlington area.[3] For many years, participating hospitals, acting through Blue Cross as agent, have made contracts with subscribers providing for prepaid hospital services. Unlike insurance policies, which generally provide for reimbursement for expenses, these contracts commit the hospitals to furnish services. Hospitalization payments are made to subscribers only when non-participating hospitals render the services.

In September 1967, the Blue Cross board of directors resolved to add a prepaid drug plan covering out-of-hospital prescription drugs. To effectuate the plan, Blue Cross proposed to issue endorsements to the hospital service contracts of subscribers who desired coverage for such prescription drugs. The endorsements would commit the participating hospitals to pay the full amount charged by any cooperating pharmacist (a pharmacist who entered into a contract with Blue Cross for the furnishing of drugs) for each prescription drug furnished a subscriber, and to pay 75% of the usual and customary amount charged by any non-cooperating pharmacist for each prescription drug furnished a subscriber.[4] Payment for drugs sold by a cooperating pharmacist would be made to the pharmacist; payment for drugs furnished by a non-cooperating pharmacist would be made at Blue Cross's option either to the pharmacist or the subscriber.

Blue Cross proposed also to enter into contracts with cooperating pharmacists for the furnishing of drugs to subscribers. Each of those contracts would commit a pharmacist to furnish prescription drugs to Blue Cross subscribers at a price equal to the pharmacist's cost plus a professional fee of $1.85 per prescription filled. And each contract would commit the participating hospitals to pay the cooperating pharmacist that price for each prescription drug furnished a subscriber.

Blue Cross solicited the support of the Virginia Pharmaceutical Association (VPA), a trade association of which 70% of Virginia

---

[3] Except for the Fairfax-Arlington area, Blue Cross serves all the area of Virginia east of and including the counties of Frederick, Shenandoah, Rockingham, Highland, Augusta, Amherst, Campbell and Pittsylvania. No other hospital plan can operate in that area unless the Commission finds that the operation of more than one plan will promote the public welfare. Va. Code Ann. § 32-195.9 (1969).

[4] Subscribers to deductible plans would pay the first 50¢ (or up to $1.50, depending on the deductible amount agreed to) of the charge for each drug furnished. Since the deductible provisions have no bearing on our decision, they will not be mentioned again.

pharmacists are members. Blue Cross representatives explained the drug plan to the VPA Executive Council at a meeting in October 1967 and to the VPA members at a meeting in December 1967. Both the Executive Council and the members approved the plan in principle.

According to the evidence, the $1.85 professional fee was presented to the VPA Council and members as a term already decided upon by Blue Cross. The members of the VPA Council discussed the acceptability of the $1.85 fee and unanimously agreed it was acceptable.

In the fall of 1967, Blue Cross submitted its drug plan endorsements to the State Corporation Commission for approval. The Commission's Bureau of Insurance approved them in November 1967.

During the one-year period beginning January 1968, 519 pharmacies (82% of the eligible pharmacies and including all 13 multi-unit or chain pharmacies in Blue Cross's area) became cooperating pharmacists by entering into contracts with Blue Cross to furnish drugs to its subscribers. Each of those contracts, which were subsequently disapproved by the Commission, committed a cooperating pharmacist to charge, and the participating hospitals to pay the pharmacist, cost plus $1.85 for each prescription filled.

Prompted by a protest from a pharmacist, the Commission conducted a public hearing in 1969 to review the previous approval of the drug plan endorsements by its Bureau of Insurance.

Testimony brought forth by Blue Cross showed that its board of directors had considered the advisability of paying cooperating pharmacists their usual and customary charges, a scale that had been adopted by certain prepaid drug plans in other states. The board decided, however, to adopt the national Blue Cross Association's general recommendation of cost plus a fixed professional fee for drug plans and the national Association's specific recommendation of $1.85 as the fixed fee in Virginia.[5]

[5] The national Blue Cross Association is a trade association of Blue Cross organizations like Blue Cross of Virginia. In 1967 the national Association resolved that, as a condition to continued membership in the Association, all its members must offer an out-of-hospital prescription drug plan. Before Blue Cross of Virginia adopted a plan, its Manager of Pharmaceutical Services studied plans in other states. He also served as a member of a task force created by the national Blue Cross and Blue Shield Associations to develop a prepaid drug program. The task force recommended a professional fee of $1.85 for Connecticut, Delaware, District of Columbia, Florida, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia and West Virginia.

Summarizing the testimony of Blue Cross's Manager of Pharmaceutical Services, Blue Cross in its brief says that it adopted the cost plus professional fee formula "to keep down the ultimate cost of drugs to the public, and to simplify administration of the drug plan".

A survey made by Blue Cross indicates, however, that the Blue Cross plan resulted in higher drug prices. Of the 12 pharmacies surveyed during the period November 1967-October 1968, 8 pharmacies would increase their average markup by changing to a fee of $1.85, 1 would make no appreciable change, and 3 would reduce their markup. The 2 multi-unit or chain pharmacies included in the survey would increase their average markup by changing to a fee of $1.85. Change to the $1.85 fee by all 12 pharmacies would have resulted in an 8¢ increase in average markup per prescription.

A cooperating pharmacist, who testified for Blue Cross, said that he planned shortly to charge all customers, not just Blue Cross subscribers, his cost plus $1.85 for each prescription filled. "Because of the large number of people who I anticipate are going to use or come under this fee system, we are very shortly switching over entirely." This pharmacist expressed the opinion that the Blue Cross plan would eventually result in a uniform charge, Blue Cross's contract price, throughout Virginia.

At least one non-cooperating pharmacist has adopted the practice of accepting 75% of his usual and customary charge as full payment for prescription drugs bought by Blue Cross subscribers. Referring to a non-cooperating pharmacist who had adopted that practice, Blue Cross's Manager of Pharmaceutical Services said "possibly he wanted to evaluate the program before he signed an agreement and wanted to determine maybe how many people this would affect in his particular pharmacy; and also I think by doing this, he certainly did not lose his patients [customers] . . .".

After the hearing, the Commission rendered an opinion on May 5, 1969 deciding that the contracts between Blue Cross and the cooperating pharmacists should be disapproved on the grounds already mentioned, violation of Virginia law by providing for direct payments to the pharmacists and violation of Federal and State antitrust laws by fixing drug prices. The Commission's order entered the same day disapproved the contracts and forbade Blue Cross to enter into or perform them.[6]

---

[6] Although the hearing was held to review the previous approval of the endorsements to the subscribers' contracts by the Bureau of Insurance, the Commission

# I

■ By statute, a group of hospitals is authorized to conduct, through an agent like Blue Cross, "a plan or plans for furnishing prepaid hospital and similar or related services". Va. Code Ann. § 32-195.1 (1969).[7] The Commission held in this proceeding that the Blue Cross prepaid drug plan is a similar or related service within the meaning of the statute. The Commonwealth not having assigned cross-error to that holding, the holding stands unchallenged. Rule 5:11.

■ The Commonwealth argues, however, that the drug plan is invalid because the participating hospitals do not conduct it, as required by the statute. The hospitals, the Commonwealth says, "are unnecessary to the plan and play no part". We disagree. By endorsements to contracts with subscribers made by Blue Cross on behalf of the hospitals, the hospitals agree to furnish drugs to subscribers under the drug plan. This commitment binds the hospitals to supply drugs whether or not the funds in the hands of Blue Cross are adequate to defray their cost. Va. Code Ann. § 32-195.4 (1969).

Nevertheless, the Commission held that by providing for direct payments by Blue Cross to pharmacists, the drug plan violates Code § 32-195.8, which reads:

> "*Application of certain provisions of law relating to insurance; payments under plan.*—* * * A plan may make payments to a non-participating hospital or physician for services rendered a person included in a subscription contract; but no payments shall be made by a plan to a person included in a subscription contract unless it be for breach of contract or unless it be for contractually included costs incurred by such person or for services received and paid for by such person and rendered by a nonparticipating hospital or physician."

Va. Code Ann. § 32-195.8 (1969).

disapproved the contracts with the cooperating pharmacists rather than the endorsements. We will treat the order as in effect disapproving the endorsements based upon the evidence presented to the Commission. Blue Cross does not contend that the order is invalid because it disapproved the contracts rather than the endorsements.

[7] "§ 32-195.1. *Hospital plans.*—A hospital or a group of hospitals may conduct directly or through an agent, who may be either an individual or a non-stock corporation, a plan or plans for furnishing prepaid hospital and similar or related services." Va. Code Ann. § 32-195.1 (1969).

Accepting the Commission's holding that under Code § 32-195.1 participating hospitals may conduct a drug plan, we disagree with the Commission's further holding that Code § 32-195.8 prohibits the hospitals' agent Blue Cross from paying pharmacies for drugs furnished to subscribers. Code § 32-195.8 has relevance to a drug plan only in that it expressly authorizes Blue Cross to reimburse a subscriber for "a contractually included cost", which covers reimbursement for drugs bought by subscribers under the plan. The Legislature may have thought this express authorization necessary because Blue Cross, unlike an insurance company which pays benefits to its policyholders, acts as agent for hospitals who agree to supply services. Nothing in Code § 32-195.8 prohibits Blue Cross from paying persons, such as pharmacists, who supply commodities needed by the hospitals to carry out their commitments under a Blue Cross plan.

## II

The Sherman Act makes illegal every contract, combination or conspiracy in restraint of trade or commerce. 15 U.S.C. § 1 (1964). And "[u]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*".[8] *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct.811, 844, 84 L.Ed.1129, 1168 (1940).

In considering the applicability of the Sherman Act, we should first identify Blue Cross's role in the distribution of drugs. Counsel for the Commonwealth contends that Blue Cross acts as agent for the pharmacists in distributing drugs to its subscribers. Blue Cross's counsel likens Blue Cross to an agent that bargains on behalf of consumers for the purchase of goods—*e.g.*, a cooperative formed by college fraternities to contract with wholesalers for food to be delivered to the several fraternity houses, or a fraternal organization that contracts for the supplying of funeral services or tombstones to its members.

Blue Cross does not act, however, as agent for the pharmacists. Rather, it acts as agent for participating hospitals who buy drugs

---

[8] This case comes to us under a tacit concession that the agreements between Blue Cross and the cooperating pharmacists sufficiently affect interstate commerce, or that the drugs which are the subject of those contracts are sufficiently within the flow of interstate commerce, to bring those agreements within the scope of the Sherman Act.

from pharmacists in order to perform the hospitals' commitments to subscribers under the drug plan. Nor should Blue Cross be likened to a cooperative formed by consumers. Rather, Blue Cross is agent for participating hospitals who are suppliers of services to consumers.

Under their agreements with Blue Cross, the cooperating pharmacists are wholesalers who commit themselves to sell drugs to the participating hospitals. The participating hospitals in turn are retailers whose customers, the subscribers under the drug plan, may pick up prescription drugs from cooperating pharmacies which look to Blue Cross for payment.

Counsel for Blue Cross contends that because the price at which drugs would be sold was fixed unilaterally by Blue Cross, not as a result of any agreement among the cooperating pharmacists, the separate contracts between Blue Cross and the pharmacists involve no combination or conspiracy under the Sherman Act. The evidence, particularly that concerning the dealings between Blue Cross and the VPA, the pharmacists' trade association, may support a finding that cooperating pharmacists collectively participated in establishing the $1.85 fee. But we need not decide that question. Whether or not the evidence supports a finding of actual horizontal agreement among the pharmacists, it supports the Commission's findings that there was an unlawful conspiracy among them:

> "It was enough that, knowing that concerted action was contemplated and invited, the distributors [the cooperating pharmacists] gave their adherence to the scheme and participated in it."

*Interstate Circuit* v. *United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610, 620 (1939).

> "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. [Citing cases.] Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. [Citing cases.]"

*Id.* at 227, 59 S.Ct. at 474, 83 L.Ed. at 620.

When Blue Cross, representing about 55 participating hospitals serving well over half of Virginia, adopted a plan for supplying out-of-hospital prescription drugs to its subscribers, it was apparent that Blue Cross was a potentially significant supplier of drugs to Virginia consumers. It was equally apparent that the success of the drug plan depended upon Blue Cross's ability to make contracts with pharmacists across the State to supply drugs to subscribers at a price acceptable to Blue Cross. Restraint upon the freedom of competing pharmacists to pursue independent pricing policies was a necessary and foreseeable consequence of the Blue Cross drug plan.

By adopting the cost plus professional fee formula, Blue Cross intended "to keep down the ultimate cost of drugs to the public". Whether higher or lower drug prices resulted, the plan promoted price uniformity among competing pharmacies. The evidence shows not only that the 519 cooperating pharmacies charge a uniform price for drugs furnished under the plan, but it indicates also that the same uniform price will be charged their customers who are not Blue Cross subscribers. At least one cooperating pharmacist has decided to make the same charge to persons not covered by the Blue Cross drug plan "because of the large number of people" he anticipates will buy drugs under the Blue Cross "fee system". In his opinion, the Blue Cross plan will result in a uniform charge, Blue Cross's contract price, throughout Virginia.

None of the pharmacists who contracted with Blue Cross for the supplying of drugs could have reasonably believed that his contract was an isolated transaction. Each must have known that Blue Cross entered into the contract pursuant to a plan that required for success the making of the same contract with other pharmacists across the State. In the language of the Commission, each pharmacist who signed a contract with Blue Cross knew that "others [had] been persuaded to sign the same contract". Blue Cross's appearances before the Council and members of the Virginia Pharmaceutical Association, soliciting support for the drug plan, made clear Blue Cross's intent to deal with pharmacists generally.

Like this case, *Interstate Circuit* v. *United States, supra,* involved separate contracts between competing sellers and a powerful buyer. Interstate Circuit, a first-run exhibitor of motion pictures, made separate contracts with distributors of motion pictures whereby each distributor agreed that it would require second-run exhibitors to charge a specified minimum admission price. Pointing out that each

distributor knew other distributors were asked to make the same agreement and that each distributor knew success of the plan depended upon cooperation by distributors, the Court held that the plan constituted an illegal combination in restraint of trade under the Sherman Act. The Court held the plan illegal, whether or not the distributors had actually agreed among themselves respecting the plan.

*United States* v. *Masonite Corp.*, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), involved separate contracts between competing buyers and a powerful seller, Masonite. The Court held the contracts illegal under the Sherman Act even though, in negotiating and entering into the agreements, each buyer

"acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others".

*Id.* at 275, 62 S.Ct. at 1076, 86 L.Ed. at 1473.

Blue Cross defends its contracts with the pharmacists on the ground that the terms were fixed unilaterally by Blue Cross, not by the competing pharmacists. In *United States* v. *Masonite, supra,* where the terms of the contracts were fixed by Masonite, not by the competing buyers, the Court said:

"Nor can the fact that Masonite alone fixed the prices, and that the other appellees [the buyers] never consulted with Masonite concerning them, make the combination any the less illegal. Prices are fixed when they are agreed upon."

*Id.* at 275-76, 62 S.Ct. at 1076, 86 L.Ed. at 1474.

The evidence in this case shows a combination of competing pharmacists formed for the purpose and with the effect of stabilizing the price of drugs. The Blue Cross drug plan therefore involves illegal price fixing under the Sherman Act.

*Live Poultry Dealers Protective Ass'n* v. *United States*, 4 F.2d 840 (2d Cir. 1924), supports our conclusion in this case on a different theory. Before the Protective Association was formed by competing buyers, "the prices for live poultry had been determined

without any rule and according to the higgling of the buyers and sellers". *Id.* at 841. The Association proposed to stabilize prices, "to give both the buyers and sellers a reliable guide upon which to deal, and thus to eliminate opportunities for bad trade practices". *Id.* To carry out the plan, Association representatives met daily with sellers of poultry and, after negotiation, set the prices the representatives believed proper for that day. There was evidence that at times the Association threatened sellers with a boycott if they sold to Association members or others at prices other than those set by the Association representatives. The court, speaking through Judge Learned Hand, held the activities of the Association violated the Sherman Act:

"We should have supposed that, if one thing were definitely settled, it was that the Sherman Act forbade all agreements preventing competition in price among a group of buyers, otherwise competitive, if they are numerous enough to affect the market."

*Id.* at 842-43.

"Among those trade practices which fall within the statute, none we think is more typical than an agreement of a substantial number of either buyers or sellers to fix the price at which alone all members of the group will trade."

*Id.* at 843. For other cases involving horizontal agreements among powerful buyers, see *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *National Macaroni Manufacturers Ass'n* v. *Federal Trade Commission*, 345 F.2d 421 (7th Cir. 1965).

The Blue Cross participating hospitals determined to inaugurate a plan for the furnishing of drugs to the subscriber-public. To implement the plan, they chose to act in concert through Blue Cross as their agent in setting the price at which they would deal with sellers of drugs (the cooperating pharmacists). The Commission found that sellers of drugs knew they would lose business if they refused to agree to sell at the price set by Blue Cross.

This agreement among a substantial number of buyers to deal only at a set price prevented competition among the buying hospitals and affected the price of drugs in Virginia. And the agreement affected not only the price charged by cooperating pharmacists, but also the

price charged by at least one non-cooperating pharmacist. Because of the Blue Cross drug plan, that pharmacist charges Blue Cross subscribers not his usual and customary charge, but 25% less than his charge to other customers.

This case therefore falls within the rule of *Live Poultry Dealers Protective Ass'n* v. *United States, supra*.

■ Blue Cross cannot justify its cost plus professional fee formula on the ground that it was intended "to keep down the ultimate cost of drugs to the public, and to simplify administration of the drug plan". "It makes no difference whether the motives of the participants are good or evil; . . . or whether the effect of the agreement is to raise or to decrease prices." *United States* v. *McKesson & Robbins, Inc.*, 351 U.S. 305, 310, 76 S.Ct. 937, 940, 100 L.Ed. 1209, 1214-15 (1956). Nor can desirable business consequences justify price-fixing arrangements. *United States* v. *Masonite Corp.*, 316 U.S. at 276, 62 S.Ct. at 1076, 86 L.Ed. at 1474.

■ Counsel for Blue Cross stress and ask us to give weight to business review letters dated January 15, 1968 and October 1, 1968, issued by the Antitrust Division of the United States Department of Justice. Those letters related to prepaid prescription drug plans to be offered by Kansas Blue Shield and Paid Prescriptions, Inc. of California that, according to counsel for Blue Cross, were the same as its drug plan. The Antitrust Division advised that on the basis of information submitted by the sponsors of the plans, the Division did not propose to initiate proceedings under the Federal antitrust laws to prevent the implementation of the plans.

Those letters were issued under the Business Review Procedure authorized by 28 C.F.R. § 50.6 (1970). A business review letter does not bind the Division to the views stated in the letter, the Division being "free to bring whatever action or proceeding it subsequently comes to believe is required by the public interest". *Id.* at 134. And a business review letter does not indicate the views of the Department of Justice "on the legal or factual issues that may be raised before the regulatory agency, or in an appeal from the regulatory agency's decision". *Id.*

The business review letters evidence the Antitrust Division's decision, based upon submitted facts that are unknown to us, not to initiate proceedings under the Federal antitrust laws to prevent the implementation of Kansas and California drug plans. The letters do not purport to express the Division's opinion whether actual experi-

ence under those plans, or the manner in which the proposed plans were operated, might indicate violation of the antitrust laws. They express no opinion about the legality of the Blue Cross drug plan as adopted and carried out in Virginia. In any event, the letters do not prompt us to change the views we have expressed.

Under the Virginia antitrust act, "[a]ny trust or monopoly . . . is unlawful, against public policy and void". Va. Code Ann. § 59.1-23 (1968). And a "trust" or "monopoly" includes a combination by two or more persons, "in any manner [to] establish or settle the price of an article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, purchasers or consumers in the sale or transportation of such article or commodity". *Id.* § 59.1-22. We agree with the Commission's holding that the Blue Cross drug plan violates the Virginia antitrust act for the same reasons we have set forth with respect to the Sherman Act.

Counsel for Blue Cross points out that the Virginia antitrust act applies "only to those trusts, combinations and monopolies which are unreasonable or inimical to the public welfare". *Id.* § 59.1-41. But since the Blue Cross plan involves a combination formed for the purpose and with the effect of stabilizing the price of drugs, the plan is *per se* unreasonable and illegal under the Virginia act as well as under the Sherman Act. *See Norfolk Motor Exchange, Inc.* v. *Grubb*, 152 Va. 471, 147 S.E. 214 (1929).

By its opinion rendered May 5, 1969, the Commission apparently decided that the cooperating pharmacists who signed contracts with Blue Cross had committed acts of unprofessional conduct. It apparently reasoned that by cooperating with the Blue Cross drug plan, these pharmacists advertised, at least indirectly, their charges for prescription drugs in violation of Va. Code Ann. § 54-426.1(4) (Supp. 1968), now Va. Code Ann. § 54-524.35(4) (Supp. 1970). The Commission should have deferred to the State Board of Pharmacy, which has the authority, after giving a pharmacist reasonable notice and an opportunity to be heard, to revoke a pharmacist's license upon a finding that he has committed unprofessional conduct. Va. Code Ann. § 54-524.22 (Supp. 1970). Affirmance of the Commission's order of May 5, 1969 therefore does not indicate concurrence with the Commission's decision in that respect.

*Affirmed.*

COCHRAN, J., concurring.

I agree with the majority that the Blue Cross contracts in question violate Federal and State antitrust laws by fixing drug prices. I disagree with the conclusion that the contracts do not violate Virginia law by calling for direct payments by Blue Cross to cooperating pharmacists. Therefore, I would affirm the May 5, 1969 order of the State Corporation Commission on both grounds.

Blue Cross is the creature of statutes enacted for the purpose of enabling hospitals and doctors to operate plans, administered by a corporate agent, offering prepaid hospital and medical services to subscribers. The subscribers are thereby benefited by receiving relief from the overwhelming expense incident to catastrophic illness. Participating hospitals and doctors benefit from assured payment for services rendered to many persons of modest resources who might otherwise be unable to pay.

The worthy purposes of Blue Cross have received legislative approval and, indeed, Blue Cross enjoys a unique preference in the form of tax immunity. While recognizing that Blue Cross was not created for the purpose of acting as an insurance company, the Legislature was bound to see that it would directly compete with such taxpaying companies selling hospitalization and medical insurance.

Viewed against this background the authority of Blue Cross to expand its activities, depending entirely upon statute, must be strictly construed.

The Commission has held, and the finding is now conclusive, that participating hospitals may offer the proposed drug plan as a "similar or related service" within the purview of Code § 32-195.1.

The Commission has also held, and no cross-error has been assigned to the holding, that under the proposed drug plan Blue Cross would be acting as agent for the participating hospitals and not as agent for the cooperating pharmacists.

The majority has decided that, contrary to the Commission's ruling, since the statute does not expressly prohibit it, Blue Cross may pay pharmacists directly. Such a conclusion, in my opinion, clearly violates not only the legislative intent but also sound principles of statutory construction. It may open the door to direct payments in the future to such recipients as funeral directors, health spa operators and department stores selling non-prescription drugs, ankle wraps and adhesive tape.

Code § 32-195.8 provides as follows for payments by Blue Cross to persons other than its principals:

". . . A plan may make payments to a nonparticipating hospital or physician for services rendered a person included in a subscription contract; but no payments shall be made by a plan to a person included in a subscription contract unless it be for breach of contract or unless it be for contractually included costs incurred by such person or for services received and paid for such person and rendered by a nonparticipating hospital or physician."

The Commission concluded, and I believe correctly, that this statute, by specifying the persons to whom payments may be made, prohibits payments to pharmacists and others who are not specifically included. This conclusion follows the generally approved principle that mention of one thing in a statute implies exclusion of others not specified. *Miller* v. *Commonwealth*, 180 Va. 36, 42, 21 S. E. 2d 721, 724 (1942); *Tate* v. *Ogg*, 170 Va. 95, 103, 195 S. E. 496, 499 (1938).

There can be no justification for finding a legislative intent to permit Blue Cross to pay directly to any person who is not specifically excluded. The development of this and similar legislation rebuts any such suggestion. Thus, the 1960 amendments to the Blue Cross Act were required to permit hospitals to offer not only hospital and medical but "similar or related" services. Additional legislation was necessary to permit dentists and optometrists to operate similar prepaid service plans. Code § 32-195.21-§ 32-195.35; Code § 32-195.36-§32-195.50.

Any extension of Blue Cross offerings or facilities should, therefore, in the future as in the past, be expressly authorized by the Legislature. If the Legislature finds it to be in the public interest to permit Blue Cross to pre-empt the field of hospitalization and health insurance it will enact appropriate legislation to this end. Until it clearly expresses its intent that Blue Cross be permitted to do whatever is not specifically prohibited, the enabling legislation should be strictly construed. *See Wheelwright* v. *Commonwealth*, 103 Va. 512, 519, 49 S. E. 647, 649 (1905).

I agree with the majority that it was beyond the province of the Commission to determine whether cooperating pharmacists, who signed contracts with Blue Cross, thereby committed acts of unprofessional conduct.