624 F.2d 476
 1980-2 Trade Cases 63,395
 VIRGINIA ACADEMY OF CLINICAL PSYCHOLOGISTS, and Robert J.
Resnick, Ph.D., Appellants,
v.
BLUE SHIELD OF VIRGINIA, Blue Shield of Southwestern
Virginia, and Neuropsychiatric Society of
Virginia, Inc., Appellees,
American Psychological Association, Amicus Curiae.
 No. 79-1345.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1980.
Decided June 16, 1980.
 
 Warwick R. Furr, II, Vienna, Va. (Thomas M. Brownell, Lewis, Mitchell & Moore, Timothy J. Bloomfield, Alan J. Kriegel, Dunnells, Duvall, Bennett & Porter, Washington, D.C., on brief), for appellants.
 Joel I. Klein, Washington, D.C. (Eugene Comey, H. Bartow Farr, III, Rogovin, Stern & Huge, Washington, D.C., R. Gordon Smith, Gilbert E. Schill, Jr., James H. Walsh, McGuire, Woods & Battle, Richmond, Va., Ronald M. Ayers, Heman A. Marshall, III, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., Francis J. Prior, Jr., Siciliano, Ellis, Sheridan & Dyer, Arlington, Va., on brief), for appellees.
 Before HALL and PHILLIPS, Circuit Judges, and HOWARD*, District Judge.
 K. K. HALL, Circuit Judge:
 
 
 1
 This controversy arises over the refusal by defendants Blue Shield of Virginia and Blue Shield of Southwestern Virginia to pay for services rendered by clinical psychologists unless such services are billed through a physician. Plaintiffs Virginia Academy of Clinical Psychologists and Dr. Robert J. Resnick, a practicing clinical psychologist, claim that this policy violates Section 1 of the Sherman Act. 15 U.S.C. § 1. The district court found no violation. Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 469 F.Supp. 552 (E.D.Va.1979). We affirm in part and reverse in part.
 
 
 2
 Since 1962, Blue Shield of Virginia (BSV or the Richmond Plan) and Blue Shield of Southwestern Virginia (BSSV or the Roanoke Plan) have included outpatient coverage for mental and nervous disorders and for psychotherapy as a method of treating those disorders. Between 1962 and 1972, Richmond Plan coverage included direct payment to psychologists for psychotherapy rendered to subscribers. In 1972, this policy was revised to allow payment only when the services were billed through a physician.
 
 
 3
 The revised policy of the Richmond Plan was announced after consultation with various provider groups, including the American Psychological Association and the defendant Neuropsychiatric Society of Virginia (NSV). Contact between the Richmond Plan and NSV, however, was particularly close.
 
 
 4
 Beginning in 1971, Dr. Levi Hulley, M.D., the head of the Plan's professional relations committee, met several times with NSV's president, Dr. Terrell Wingfield, M.D., over the question of payment for psychotherapy. Cooperation between the two groups followed: NSV, at the Plan's request, conducted a survey of Virginia psychiatrists on various aspects of psychiatric practice and later passed a resolution recommending, inter alia, that the Richmond Plan terminate direct payment to clinical psychologists. Immediately prior to adopting its policy, Richmond Plan officials met with a special NSV committee to discuss the scope of mental health coverage. The Plan adopted some of NSV's recommendations, including that of refusing to cover services rendered by psychologists unless billed by a physician.
 
 
 5
 Following implementation of the non-payment policy, the Virginia legislature, in 1973, added another dimension to the problem by passing a "Freedom of Choice Statute," Va.Code § 32-195.10:1 (now amended and codified at § 38.1-824), which requires Blue Shield plans to pay directly for services rendered by licensed psychologists.[1]
 
 
 6
 The passage of this legislation provoked discussion between the Roanoke Plan and the Richmond Plan, resulting in collaboration between the two Plans to continue denying direct payment to psychologists in violation of the statute and to pursue litigation to test the statute. A test case was filed in state court by a subscriber and her psychologist against the Richmond Plan, but was later voluntarily nonsuited. In 1976, the State Corporation Commission brought an action against the Richmond Plan to compel compliance with the statute. Commonwealth of Virginia ex rel. State Corporation Comm'n v. Blue Cross of Virginia, Case No. 19829.
 
 
 7
 The Roanoke Plan was not a party to either State proceeding, but maintained an official policy of denying payment, despite the statute, until November 1976. By the time this case was tried, however, most Roanoke Plan contracts allowed direct payment to psychologists.
 
 
 8
 This action was filed on July 14, 1978. Following the voluntary dismissal of defendant Medical Service of District of Columbia, Inc., a Blue Shield Plan operating in Northern Virginia, the case was tried to the court in January 1979. On April 9, 1979, the district court issued a Memorandum Opinion and Order, holding: (1) Plaintiffs had failed to prove any contract, combination or conspiracy cognizable under Section 1 of the Sherman Act; (2) even if there was such an arrangement, it was not in restraint of trade; and (3) the defendants' conduct was exempt from the antitrust laws under the McCarran-Ferguson Act. 15 U.S.C. § 1012(b).
 
 
 9
 * The district court held that the plaintiffs had failed to prove a "contract, combination . . . , or conspiracy" within the reach of Section 1 of the Sherman Act. First, it found that agreement between the two Blue Shield Plans was exempt from the Sherman Act. It held that the Plans' decision to challenge the Virginia "Freedom of Choice" legislation was protected activity under the First Amendment, and the joint administration of "national accounts" restricting payment to psychologists was within the "state action" exemption of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). 469 F.Supp. at 557.
 
 
 10
 Second, the court found no agreement between the Plans and NSV. The court noted that "NSV cooperated closely with BSV by urging BSV to adopt the policies in question and by advising BSV on their implementation," but found that this was part of a program of consultation with many provider groups, including the American Psychological Association. The district court concluded:
 
 
 11
 Though prior inquiry, consultation, and negotiation clearly took place, no contract was entered into, no combination formed, and no conspiracy existed. Section 1 of the Sherman Act does not prohibit a business entity which needs information and advice from obtaining information and advice from other knowledgeable business entities. The operation of a medical insurance plan would be, for all practical purposes, impossible of consultation and cooperation with provider groups were barred.
 
 
 12
 469 F.Supp. at 559.
 
 
 13
 a. Blue Shield
 
 
 14
 The district court treated the Plans as separate, independent entities. This characterization is only partly accurate. Noticeably absent from the district court's discussion is any mention of the plaintiff's principal theory on appeal: that the Blue Shield Plans are combinations of physicians, operating under the direction and control of their physician members.[2]
 
 
 15
 Blue Shield Plans are not insurance companies, though they are, to a degree, insurers. Rather, they are generally characterized as prepaid health care plans, quantity purchasers of health care services. See Group Life and Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 225-232, 99 S.Ct. 1067, 1080-1083, 59 L.Ed.2d 261, 277-80 (1979). A plan may be viewed as an agent of its subscribers, a buyers cooperative. See Jordan v. Group Health Association, 71 App.D.C. 38, 107 F.2d 239 (1939). But see Blue Cross v. Commonwealth, 211 Va. 180, 176 S.E.2d 439, 443 (1970). But in a real and legal sense, the Blue Shield Plans are agents of their member physicians.[3]
 
 
 16
 The Virginia Statute authorizing the creation of Blue Shield Plans states:
 
 
 17
 Medical and Surgical Plans. A group of physicians may conduct directly or through an agent, who may be either an individual or nonstock corporation, a plan or plans for furnishing prepaid medical or surgical or similar or related services or both.
 
 
 18
 Va.Code § 38.1-811 (formerly codified at § 32-195.2). The Plans in this case, organized under the above provision, are made up of "participating physicians" who as "members" of the plan contract to provide services to subscribers, and are reimbursed by the Plan.
 
 
 19
 State law requires that the majority of the board of directors of such a plan be "health care providers," Va.Code § 38.1-817. The by-laws of the Richmond Plan, however, until very recently, provided for a physician majority:
 
 
 20
 The board shall have fifteen members. Not less than eight of such members shall be Doctors of Medicine or Osteopathy who are engaged in active practice and who are members of the plan.
 
 
 21
 The Medical Society of Virginia is identified as "sponsor" of the Richmond program, and its by-laws indicate that five of the physician members of its board "shall be elected from among those designated by the Medical Society of Virginia."
 
 
 22
 The Supreme Court of Virginia emphasized collective nature of a similar type of plan in Blue Cross v. Commonwealth, 211 Va. 180, 176 S.E.2d 439 (1970). There the court held that certain Pharmacy Agreements entered into between Blue Cross and participating Pharmacists violated the Sherman Act. Among the several combinations found in that case was that of the participating hospitals which constitute Blue Cross, in the same fashion as participating physicians constitute Blue Shield. Compare Va.Code § 38.1-810 with § 38.1-811. The court characterized the arrangement as follows:
 
 
 23
 The Blue Cross participating hospitals determined to inaugurate a plan for the furnishing of drugs to the subscriber-public. To implement the plan, they chose to act in concert through Blue Cross as their agent in setting the price at which they would deal with the sellers of drugs (the cooperating pharmacists). The Commission found that sellers of drugs knew they would lose business if they agreed to sell at the price set by Blue Cross.
 
 
 24
 Id. at 190, 176 S.E.2d at 445. (emphasis added).[4]
 
 
 25
 It is not sufficient to assert, as defendants do, that a corporation cannot conspire with itself. We must look at substance rather than form. E. g. United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).[5] Antitrust law has always been sensitive to the realities of the marketplace and has been particularly watchful of organizations of the various trades or professions. See, e. g. National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Fashion Originators Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).
 
 
 26
 We think the uncontradicted evidence and district court findings show sufficient physician control of Blue Shield of Richmond to bring its actions within the purview of Section 1 of the Sherman Act.[6] See United States v. Sealy, Inc., supra.
 
 
 27
 Although appellants' case focuses primarily on the activities of the Richmond Plan, the Roanoke Plan is similarly structured. Moreover, the district court found that the two Plans had "collaborated."[7] The court concluded, however, that the collaboration was exempt from Sherman Act scrutiny because it "revolved in the main around a challenge in State tribunals to the Virginia statutory scheme requiring such direct payment." 369 F.Supp. at 557. We do not think that the "Noerr-Pennington doctrine," upon which the court relied, is applicable to this case.
 
 
 28
 In Eastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of railroads had conducted a misleading advertising campaign designed to influence legislative action which would place trucking firms at a competitive disadvantage. The Supreme Court held that this conduct was protected by the First Amendment and therefore outside the Sherman Act despite its plainly anticompetitive purpose and incidental anticompetitive effects. In United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court exempted from the Sherman Act an alleged collective effort by the union and mine operators to induce the Secretary of Labor to set a minimum wage so high that only larger government contractors could afford to sell coal to the TVA. The Noerr-Pennington exemption was later extended, in a somewhat narrower fashion, to genuine administrative and judicial litigation in California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).
 
 
 29
 The Noerr-Pennington doctrine protects the first amendment right to petition. Feminist Women's Health Center v. Mohammad, 586 F.2d 530, 542 (5th Cir. 1978); see also California Motor Transport, supra, 404 U.S. at 510, 92 S.Ct. at 611. The exemption does not apply in this case because the Plans, especially Roanoke, never truly exercised that right.
 
 
 30
 In response to the passage of Freedom of Choice legislation in Virginia, Officers of the two Plans met and decided to challenge the statute. Following the 1975 "Summit Meeting" at which the possibility of a declaratory judgment action was discussed, the Roanoke Plan brought itself into conformity with Richmond's policy of noncompliance by adopting a resolution to deny payment to psychologists in spite of the statute. The declaratory action was not pursued, and the court challenge against BSV by a psychologist and his patient was nonsuited and never revived. The challenge to the statute finally occurred, but at the instance of the State Corporation Commission[8] and did not include the Roanoke Plan.
 
 
 31
 The collective action of the Plans in this case thus falls short of the activity protected by Noerr-Pennington.[9] The collaboration in defiance of the statute may have been calculated to provoke a judicial resolution of the Plans' grievance, but it amounted to no more than an agreement to persist in economically restrictive commercial activity in the face of a State law designed to open up the health care market. We think the efforts of States to promote competition and consumer choice through legislation would be seriously hampered if Noerr-Pennington were extended so that those who would flout such a law could avoid antitrust liability in the process.[10]b. Neuropsychiatric Society of Virginia
 
 
 32
 Our decision as to the Blue Shield Plan does not affect the Neuropsychiatric Society of Virginia. The physician domination of Blue Shield does not necessarily render it unable to operate independently vis-a-vis other economic entities. The evidence shows that NSV cooperated very closely with the Richmond Plan and received more attention than other provider groups, but the evidence also shows that the Plan rejected some of NSV's proposals, while accepting others. We think there was a sufficient factual basis for the district court's finding that there was no conspiracy between the two groups.
 
 
 33
 Plaintiffs failed to show that NSV had some control over Blue Shield's decision-making, or that Blue Shield agreed to abide by the decision of NSV in formulating its policy. It has long been recognized that a business may unilaterally choose those with which it will conduct business. United States v. Colgate Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). A purchaser of services, acting independently, may lawfully solicit proposals from various providers and choose from among them. E. g. Scranton Construction Co. v. Litton Industrial Leasing, 494 F.2d 778 (5th Cir. 1974). Thus, it was not illegal for NSV, as "seller" of such services, to make recommendations aimed at persuading Blue Shield to adopt its proposal and use its services, absent some form of coercion. Accordingly, we affirm the judgment in favor of NSV.
 
 II
 
 34
 We next consider whether defendants' policy is exempt from the antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). To fall within that exemption the challenged conduct must be the State regulated "business of insurance," and not a boycott, 15 U.S.C. § 1913(b). Group Life and Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); St. Paul Fire and Marine Ins. Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). We hold that the defendants' conduct is not the "business of insurance." Plaintiffs' assertion that they have been subjected to a boycott will be discussed in part III, infra.
 
 
 35
 In Royal Drug, supra, the Supreme Court held that certain Pharmacy Agreements, entered into between Blue Shield and participating pharmacies for the purpose of providing drugs at a cost to Blue Shield's policyholders of $2.00 per prescription, were not the "business of insurance." While the present case is distinguishable from Royal Drug, we think the Supreme Court's opinion sheds considerable light on this case.
 
 
 36
 The majority in Royal Drug explained that at the time of the enactment of the McCarran-Ferguson Act, activities of programs like Blue Shield were not considered to be insurance at all. 440 U.S. at 225-229, 99 S.Ct. at 1080-1082, 59 L.Ed.2d at 277-79. That discussion is not dispositive of this case, for the Supreme Court also noted,
 
 
 37
 (t)his is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from provider agreements with participating pharmacies, may not be the "business of insurance" within the meaning of the Act.
 
 
 38
 Id., 440 U.S. at 320 n. 37, 99 S.Ct. at 1082 n. 37, 59 L.Ed.2d at 279 n. 37. Nevertheless, the court's analysis reinforces our view that the exemption should be narrowly applied to Blue Shield plans, especially where provider control is in issue. See, id., 440 U.S. at 232 n. 40, 99 S.Ct. 1083 n. 40, 59 L.Ed.2d at 280 n. 40.
 
 
 39
 The essence of the business of insurance is the relationship between the insurance company and its policyholder. SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); Bartholomew v. Virginia Chiropractors Ass'n, 612 F.2d 812 (4th Cir. 1979), cert. denied --- U.S. ----, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980). We are persuaded that the defendants' policy regarding payment of clinical psychologists is only tangential to that relationship in that it does not affect the benefit conferred upon the subscriber.
 
 
 40
 Were we confronted with a decision by the Plans to deny payment for mental and nervous disorders for psychotherapy as a method of treating those disorders we might conclude that the decision was an insurance decision the refusal to underwrite a specific risk. In the present case, however, both Plans have been covering these mental and nervous disorders in their contracts since at least 1962. Their decision regarding psychologists was not whether to underwrite the risk of those disorders or even the need for psychotherapy; rather it was a question of who they would pay for such services. The coverage remained the same.
 
 
 41
 Thus, the case at bar is similar to Royal Drug, where the Court held that the cost savings obtained by using specific providers, even though mentioned in the subscriber contract, was not sufficiently a part of the insurer-insured relationship to be the "business of insurance" because the subscribers received the same benefit the assurance that they could obtain drugs for a maximum payment for $2.00 on each prescription in any event. 440 U.S. at 216-218 and n. 14, 99 S.Ct. at 1075-1076 and n. 14, 59 L.Ed.2d at 271-272 and n. 14.
 
 III
 
 42
 The final, critical issue is whether these combinations were "in restraint of trade." 15 U.S.C. § 1. The district court held that under the rule of reason, no violation was established. We disagree.
 
 
 43
 The district court began: "(t)he starting point in deciding the proper factual context for this case is deciding what sector of the economy is affected. . . . In other words, the court looks to see who is competing with whom." 469 F.Supp. at 560. The court found that clinical psychologists are not equal providers of therapy with psychiatrists because they do not render medical treatment and are not qualified to diagnose nervous and mental disorders or ascertain their source. The court further found that medical necessity in most, if not all cases requires regular contact between the psychologist's patient and a medical doctor.
 
 
 44
 The district court concluded that the clinical psychologist is not competitive with the psychiatrist unless the clinical psychologist is working under the "supervision" of a medical doctor. A psychologist working with a physician, the court continued, is paid by the Plans on an equal basis with a psychiatrist, except that the psychologist must bill through a physician.
 
 
 45
 The court can well understand that plaintiffs do not like to bill through a physician as a matter of professional pride. The evidence shows that billing through a medical doctor is a requirement of the Blue Shield plan as a means of ascertaining that the treatment given and billed for was medically necessary. This procedure also tends to promote contact between the clinical psychologists and the physicians at all stages of treatment, and thus enhances the supervisory process.
 
 
 46
 469 F.Supp. at 561.
 
 
 47
 Appellants assert that the evidence establishes a boycott and therefore their exclusion from direct Blue Shield coverage is illegal per se. We agree that the challenged policy closely resembles that alleged in Ballard v. Blue Shield of Southern West Virginia, 543 F.2d 1075 (4th Cir. 1976), which we found to be a boycott. Nor does the comparison necessarily fail because the concerted refusal to deal is conditional, rather than absolute. See Webb v. Utah Tour Brokers Ass'n, 568 F.2d 670, 675-76 (10th Cir. 1977); Proctor v. State Farm Mutual Auto Ins. Co., 561 F.2d 262, 276 n. 23 (D.C. Cir. 1977); Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930).
 
 
 48
 The "boycott" characterization, however, avails us little in determining whether an agreement such as this is per se illegal. Cf. Broadcast Music Inc. v. Columbia Broadcasting System, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Because of the special considerations involved in the delivery of health services, we are not prepared to apply a per se rule of illegality to medical plans which refuse or condition payments to competing or potentially competing providers. See Goldfarb v. Virginia State Bar, 421 U.S. 773, 788 n. 17, 95 S.Ct. 2004, 2013 n. 17, 44 L.Ed.2d 572; Arizona v. Maricopa County Medical Society, 1980-1 Trade Cas. P 63,239 (9th Cir. 1980); Note, The Professions and Noncommercial Purposes: Applicability of Per Se Rules Under the Sherman Act, 11 U.Mich.J.L.Ref. 387 (1978).
 
 
 49
 While we agree with the district court's rejection of a per se rule in this case, we think the court's analysis was misdirected. The rule of reason looks to the impact of the challenged practice upon competitive conditions. National Society of Professional Engineers v. United States, 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1979). The district court's finding that "the clinical psychologist is not competitive with the psychiatrist in treating nervous and mental disorders unless the clinical psychologist is working under the supervision of a medical doctor" reflects a value judgment, rather than an evaluation of anticompetitive effects.
 
 
 50
 The record demonstrates that psychologists and psychiatrists do compete; indeed it is susceptible to judicial notice. Both provide psychotherapy, 469 F.Supp. at 560, and are licensed to do so by State law. See Va.Code §§ 54-273(10), -274, -309.1, -936 (1978 Replacement Vol.) Competition in the health care market between psychologist and M.D. providers of psychotherapy is encouraged by the legislature, see Va.Code § 38.1-824, and its existence is well documented.[11]
 
 
 51
 The Blue Shield Plans are a dominant source of health care coverage in Virginia. Their decisions as to who will be paid for psychotherapy necessarily dictate, to some extent, which practitioners will be chosen from among those competent under the law to provide such services.
 
 
 52
 Whether the "medical necessity" of referral and close contact between the therapist and a physician satisfies the rule of reason, as a cost control measure, is a matter not before us. The Plan's requirement that the psychologists' fee be billed through a physician, however, cannot stand.
 
 
 53
 The issue is more than one of professional pride. State law recognizes the psychologist as an independent economic entity as it does the physician. The Blue Shield policy forces the two independent economic entities to act as one, with the necessary result of diminished competition in the health care field. The subscriber who has a need for psychotherapy must choose a psychologist who will work as an employee of a physician; a psychologist who maintains his economic independence may well lose his patient. In either case, the psychologist ceases to be a competitor.
 
 
 54
 Forewarned by the decision in National Society of Professional Engineers, supra, that it is not the function of a group of professionals to decide that competition is not beneficial in their line of work, we are not inclined to condone anticompetitive conduct upon an incantation of "good medical practice." Moreover, we fail to see how the policy in question fulfills that goal. Any assertion that a physician must actually supervise the psychologist to assure the quality of the psychotherapy treatment administered is refuted by the policy itself. The Blue Shield policy provides for payment to psychologists for psychotherapy if billed through any physician not just those who regularly treat mental and nervous disorders. It defies logic to assume that the average family practitioner can supervise a licensed psychologist in psychotherapy, and there is no basis in the record for such an assumption.
 
 
 55
 There are, of course, procompetitive reasons for requiring examination and consultation by a physician in order to assure that psychotherapy is not needlessly performed to treat a problem with physical etiology, but such safeguards must be accomplished in ways which do not sacrifice the economic independence of the psychologist.
 
 
 56
 The elimination of the bill-through provision does not preclude a variety of other cost control and quality control measures by Blue Shield. It does, however, expand consumer and provider alternatives. In addition, competition from licensed non-M.D. providers is likely to result in lower costs and the elimination of needless duplication of administrative costs created by the bill-through requirement.
 
 
 57
 For the reasons stated above, we affirm the judgment in favor of defendant NSV and reverse the judgment for the Blue Shield defendants. The case is remanded to the district court for appropriate relief.
 
 
 58
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 
 
 *
 Honorable Joseph C. Howard, United States District Court for the District of Maryland, sitting by designation
 
 
 [1]
 The Statute provided:
 § 38.1-824. Services of certain practitioners other than physicians to be covered. No plan for furnishing prepaid medical and surgical, and similar or related services, or any of such services, shall fail or refuse, either directly or indirectly, to allow or to pay for such services, or any part thereof, rendered by any doctor of podiatry, doctor of chiropody, or optometrist, optician and psychologist duly licensed to practice in Virginia, to the holder of any contract or subscription contract issued under or pursuant to such plan if the services rendered (i) are services provided for by such contract or subscription contract . . . and, (ii) are services which the doctor of podiatry, doctor of chiropody or optometrist, optician and psychologist is licensed to render in Virginia. (1966, c. 276; 1973, c. 428.)
 
 
 [2]
 Provider control of the "Blues" has been the subject of considerable controversy in recent years, in Congress, see Skyrocketing Health Care Costs: The Role of Blue Shield, Hearings before the Subcommittee on Oversight and Investigations, Committee on Interstate and Foreign Commerce, House of Representatives, 95th Cong., 2d Sess. (1978), and the Federal Trade Commission, Medical Participation in Control of Blue Shield and Certain Other Open-Panel Medical Prepayment Plans, FTC Bureau of Competition (Apr. 1979) as well as in recent scholarly efforts. See M. Thompson, Antitrust and the Health Care Provider, 35 (1979); Goldberg and Greenberg, The Effect of Physician Controlled Health Insurance: U. S. v. Oregon State Medical Society, 2 J. Health Pol. Pol'y & L 48 (1977); Havighurst, Professional Restraints on Innovation in Health Care Financing, 1978 Duke L.J. 303, 336-37, 348, 375-76 (1978); Kallstrom, Health Care Cost Control by Third Party Payors: Fee Schedules and the Sherman Act, 1978 Duke L.J. 645 (1978). The problem of provider control was also alluded to by the Supreme Court in Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 232 n.40, 99 S.Ct. 1067, 1083 n.40, 59 L.Ed.2d 261, 281 n.40
 In United States v. Oregon Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952), the provider control of Oregon Physicians Service was unchallenged, id. at 330, 72 S.Ct. at 694. Goldberg & Greenberg, supra at 65-66.
 
 
 [3]
 A Blue Shield advertising brochure used until recently to attract physician membership stated:
 Blue Shield is a nationally recognized symbol of voluntary prepayment coverage for medical expenses. It is known as the "doctors' plan for the people," but it is, realistically, also the doctors' plan for the doctors, with control and guidance originating from members of the medical profession.
 
 
 [4]
 The Blue Shield brochure described in note 3 continued:
 When new programs are established, they are sustained by reimbursement principles representing the collective judgments of area physicians acting through societies and through Board representation.
 
 
 [5]
 In United States v. Sealy, Inc., the Supreme Court rejected the contention of Sealy manufacturer-licensees that their exclusive territories were vertically imposed by the licensor, Sealy, Inc. The Court found that Sealy, Inc. was substantially owned and controlled by the manufacturer-licensees, and therefore its action in allocating territories was actually a horizontal agreement between its licensee stockholders. Accord, United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)
 
 
 [6]
 A most illuminating illustration of the provider interest at work in the administration of the Plans is this statement by Levi W. Hulley, Jr., M.D., medical director of the Richmond Plan, which appears in the May 25, 1972 minutes of the Committee on Mental Health of the Medical Society of Virginia:
 BLUE CROSS-BLUE SHIELD COVERAGE;
 Dr. Hulley assured the Committee of the interest of Blue Cross-Blue Shield where psychiatric services are concerned and discussed a report prepared under the direction of Dr. Wingfield and a special committee of the Neuropsychiatric Society.
 The report is concerned with services provided by psychiatrists and charges involved. It has been referred to the Blue Shield Board for consideration and final disposition.
 It was brought out that a number of groups, which have a part in the overall mental health picture, are little by little working their way into the therapy field. It seemed to be the consensus that The Medical Society of Virginia should take a firm stand on this encroachment and seek to stop it once and for all.
 It was brought out that psychotherapy apparently means different things to different people and it was agreed that it should be defined as that performed by psychiatrists or under the direct supervision of psychiatrists.
 
 
 [7]
 See American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1243 (3rd Cir. 1975)
 
 
 [8]
 Contrary to the suggestion by the district court, it was the Commission and not BSV which brought the action. The constitutionality of the statute was upheld by the Commission. Commonwealth of Virginia ex rel State Corporation Comm. v. Blue Cross of Virginia, Case No. 19829 (Feb. 14, 1979)
 
 
 [9]
 We do not hold that the defendant's conduct was within the "sham" exception to the Noerr-Pennington doctrine. See Noerr, supra, 365 U.S. at 144, 81 S.Ct. at 533, California Motor Transport, supra. The "sham" exception applies when the right is actually exercised, but in a manner calculated to interfere directly with a competitor's business. Repeated frivolous litigation calculated to delay a competitor's licensing would be an illegal sham. But until the right to petition is exercised, the "sham" inquiry is not reached
 
 
 [10]
 We are also unable to agree with the district court's application of the State action exemption to the collaboration of the Richmond and Roanoke Plans in the administration of "national accounts," the operation of which is fully described in the district court's opinion. 469 F.Supp. at 557-58. Although Virginia may have created a need for cooperation by prohibiting the Plans from operating outside their assigned territories, the State certainly does not compel the defendants to exclude psychologists from direct coverage. The application of the State action exemption in this case is thus precluded by our decision in Ballard v. Blue Shield of Southern West Virginia, Inc., 543 F.2d 1075 (1976)
 (N)o action on the part of West Virginia compels the defendants to exclude chiropractors from their insurance plans. West Virginia law specifically authorizes the defendant companies to insure the costs of chiropractic treatment, but the defendants have not elected to provide this coverage. Therefore they can claim no immunity under Parker v. Brown. Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); Goldfarb v. Virginia State Bar, 421 U.S. 773, 778-92, 95 S.Ct. 2004 (2008-15), 44 L.Ed.2d 572 (1975).
 543 F.2d at 1079. See also, California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In this case the state does not even permit the challenged policy; A fortiori it is not state action.
 Despite our disagreement with the Court's reasoning, we do not rest our finding of liability on the cooperation of the plans in the management of these accounts. Each national account involves a contract between one "control plan" and subscriber whose employees reside in several Blue Shield territories. The terms are arrived at between those parties; and the "participating plans" act as the agents of the control plan in administering the contract in their respective areas. They are required to follow exactly the terms of the control contract, and are reimbursed by the control plan for their expenditures. This cooperation certainly is not in restraint of trade.
 
 
 [11]
 One could scarcely find a more revealing statement of competitive conditions than the statement of Dr. Hulley, supra n. 6 concerning the need to stop "encroachment" by non-M.D. providers of therapy